---

(No. 13205.—Judgment affirmed.)
THE AMERICAN HOMINY COMPANY, Plaintiff in Error, *vs.*
THE NATIONAL BANK OF DECATUR, Defendant in Error.

*Opinion filed June 16, 1920—Rehearing denied October 20, 1920.*

1. BILLS AND NOTES—*draft with payee's name forged thereon by drawer is payable to bearer.* Under sub-section 3 of section 9 of the Negotiable Instrument act a draft with the payee's name forged thereon by the drawer at the time he negotiated it is payable to bearer, and the bank which collected the draft is not liable to the drawee, which paid the draft not knowing of the forgery. (*Bartlett* v. *First Nat. Bank,* 247 Ill. 490, adhered to.)

2. SAME—*when drawer of a draft has apparent authority, as agent, to indorse name of fictitious payee.* Where the general agent of a corporation engaged in buying and selling grain is authorized to buy all the grain that is to be bought from farmers in a certain locality and to pay for the grain by drawing drafts on the corporation, the drafts are in legal effect the promissory notes of the corporation, and the act of the agent in drawing such drafts in favor of fictitious persons and indorsing the names of fictitious payees is within the apparent scope of the agent's authority.

3. PRINCIPAL AND AGENT—*a corporation is bound by the acts of its agent within apparent scope of his authority.* A corporation is bound by the acts of its agent in the exercise of powers within the apparent scope of his authority unless special limitations upon his powers are brought to the notice of the party dealing with him.

CARTWRIGHT, C. J., and FARMER and DUNN, JJ., dissenting.

WRIT OF ERROR to the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Macon county; the Hon. WILLIAM K. WHITFIELD, Judge, presiding.

VAIL, POGUE & ALLEN, for plaintiff in error.

LEFORGEE, BLACK & SAMUELS, REDMON, HOGAN & REDMON, and MOSES, ROSENTHAL & KENNEDY, (WALTER BACHRACH, of counsel,) for defendant in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiff in error, the American Hominy Company, instituted an action in assumpsit in the circuit court of Macon county against the National Bank of Decatur, defendant in error, and on trial obtained judgment for $2359.63. On appeal to the Appellate Court the judgment was reversed with a finding of fact, and the cause has been brought here on petition for *certiorari.*

The declaration consists of the common counts and six special counts. The action was brought to recover money paid by plaintiff in error to defendant in error upon four drafts, upon which plaintiff in error subsequently and after payment discovered that the indorsement of the payee's name had been forged. All the drafts were identical in form, although they varied in amounts, dates, payees, indorsements and description of grain for which they purported to have been given. The draft set out in one of these special counts is as follows:

"SUFFERN-HUNT MILLS, BRANCH AMERICAN HOMINY CO.
*White Corn Products.*                  No. 2246.
GARBER, ILL., *Sept. 15, 1915.*
"Pay to the order of Andrew Molch $380.25, three hundred eighty and 25/100 dollars, for 809.2 bushels oats at .47 per bu.
To Suffern-Hunt Mills, Decatur, Ill."   JOHN C. MEYER, *Agent.*

The count alleged that at the time of the presentment of said draft it bore upon the back the indorsement of Andrew Molch, the payee; that Meyer, at the time he drew said draft as the agent of plaintiff in error and at the time of the presentment of the draft, was authorized by plaintiff in error to draw drafts upon itself and to deliver the same to the payees named therein in payment only for grain in the amounts and at the prices named on the face of such drafts or in payment of supplies or wages noted upon the face of the drafts, and was not then authorized to draw any drafts upon plaintiff in error, in said form or otherwise, payable to bearer or in payment of anything other than grain in the manner aforesaid, nor to deliver the same to any persons other than the persons to whom moneys were then due from plaintiff in error for grain purchased and delivered or to be delivered to plaintiff in error in its elevator in Garber, save only for supplies and wages, which last named drafts also were required to show upon their face for what purpose they were drawn, issued and delivered; that the draft above mentioned was not drawn and delivered by Meyer, as agent aforesaid, to the payee therein in payment of grain nor for any other purpose, but, on the contrary, the name of the payee was prior to its presentment indorsed in writing on the back thereof by some person other than the payee and without the consent, authorization, knowledge or ratification of the payee or plaintiff in error, by reason whereof defendant in error could not and did not, at the time of the presentment of said draft as aforesaid, lawfully trace the title to the same through the payee or otherwise; that afterwards plaintiff in error, who then did not know that the name of the payee upon said draft presented as aforesaid had been forged, nor that the draft had not been drawn or delivered to the payee in payment for grain, nor that the defendant in error did not then have lawful title to the draft, and who then believed the draft had been by Meyer, as agent aforesaid, drawn

284 — 15

and delivered to Molch in payment of grain purchased by Meyer for plaintiff in error, then and there paid to defendant in error the amount of said draft. Three of the other special counts are in substantially the same language, except that they declare upon three other drafts drawn in the same form, ostensibly for the payment of grain and payable to the order of the respective payees. The fifth special count declares on all the drafts together, and alleges, in substance, that the indorsements on the back thereof were not written by the respective payees but were forged. The sixth special count declares upon all the drafts and alleges that plaintiff in error paid the same under a mistake of fact.

The testimony in the record shows the defendant in error bank received the drafts in question for the purpose of collection, only, and that it presented them to plaintiff in error, who voluntarily paid the same; that defendant in error then remitted the money to the persons or banks from whom or which it had received the drafts for collection, and that defendant in error had no interest of any kind in the transaction except merely as a collection agency; that the plaintiff in error is a corporation engaged in the business of buying, selling and milling grain and has many branches or branch offices throughout the country. The testimony further shows that the office for central Illinois is located at Decatur and was then operated under the name of Suffern-Hunt Mills, and its various agents and offices in the vicinity of Decatur were operating under instructions and directions from the Suffern-Hunt Mills; that among other elevators owned and operated by plaintiff in error was one located at Garber, a small station in Ford county; that for about fifteen years John C. Meyer had been the agent for plaintiff in error at Garber; that he also conducted during this period of time a general merchandise business and was the only merchant or storekeeper in the village, selling in his business coal, farm implements, dry goods, boots and shoes, groceries and other merchandise; that he purchased grain

for plaintiff in error at prices directed to be paid by the
latter and paid for the same by drafts drawn on plaintiff
in error, which specified upon the face thereof the amount
and kind of grain purchased and the price paid for the
same, and were always signed "John C. Meyer, agent;"
that he never signed any of the drafts in the name of the
American Hominy Company or Suffern-Hunt Mills. Meyer
testified that many of the farmers from the surrounding
neighborhood traded with him at his store on credit, and
that frequently when he purchased grain from a farmer
having a credit account with him in his store he settled
for the grain by giving the farmer credit for the price of
the grain on such farmer's store bill and then drew a draft
on the plaintiff in error, signed by his own name as agent,
and re-paid himself for the amount of the store bill so
considered as settled; that the agent of plaintiff in error
operating the Suffern-Hunt Mills at Decatur knew of these
various transactions. The officers of the Suffern-Hunt
Mills deny that they had any knowledge that Meyer fol-
lowed such methods. The testimony further shows that
Meyer was required by plaintiff in error to, and did, make
reports daily, or at other stated intervals, of the amount
and kind of grain that had been purchased by him for
plaintiff in error and also the amount of grain that had
been shipped by him and the amount on hand. Meyer tes-
tified that the grain for which some of these drafts were
drawn was purchased from and delivered by the tenants
of the respective landlords, and that he himself settled with
the landlords either through merchandise bought by the
latter at his store or by payment to them out of his own
funds. On the record before us, however, it appears to be
undisputed that the four drafts here in question were never
delivered by Meyer to the respective payees named therein,
but that Meyer himself indorsed the names of the payees
on the back of the respective drafts and delivered the same
to the commission firm of James E. Bennett & Co. of De-

catur in payment of transactions covering his personal deals with said firm; that in due course of time these drafts were delivered to the defendant in error for collection and were paid by plaintiff in error.

Counsel for plaintiff in error argue that the indorsements of the names of the respective payees on these drafts were forgeries, and that defendant in error by presenting said drafts to plaintiff in error warranted the genuineness of the indorsements thereon; that when a drawee pays a draft on which the payee's name is forged, there is no consideration for such payment and the drawee may recover the money thus paid. Counsel for defendant in error argue that plaintiff in error has no right to recover because the payees in the drafts were fictitious persons, and it was never intended that the drafts should be delivered to the payees therein named or that the payees were to have any interest therein, and that the drafts were consequently payable to the bearer under sub-section 3 of section 9 of the Negotiable Instrument act, which provides that a negotiable instrument is payable to bearer "when it is payable to the order of a person known by the drawer or maker to be fictitious or non-existent, or of a living person not intended to have any interest in it." (Hurd's Stat. 1917, p. 2001.) In construing these provisions of the Negotiable Instrument act the Appellate Court made the following finding of facts: "The court finds that each draft in question was payable to the order of a person not intended by Meyer, the drawer, to have any interest in it, or that it should ever be delivered to the payee named therein, or the payee should indorse said draft in order to receive payment therefor, or for the purpose of negotiating the same;" that therefore plaintiff in error was not entitled to recover from defendant in error the amount of the drafts in question.

Counsel for plaintiff in error in this case insist that the Appellate Court erred in construing the Negotiable Instrument act, and particularly the decision of this court in *Bart-*

*lett* v. *First Nat. Bank,* 247 Ill. 490, where this court said (p. 499) : "The drafts drawn by R. L. Walsh in the name of the appellants against themselves were all made payable to some person who resided near Reddick, or bearer, and in the sense that there were such individuals as payees the payees named in the drafts were not fictitious persons. At the time, however, Walsh drew said drafts he did not intend that the persons whose names he inserted as payees in said drafts should have any interest in said drafts, or that said drafts should ever be delivered to said payees, or that said payees should indorse said drafts in order to receive payment therefor or for the purpose of negotiating the same. In the eye of the law, therefore, the payees named in said drafts were not *bona fide* payees but mere fictitious persons. Said drafts were, therefore, in law payable to bearer, and were transferable, therefore, by delivery, and upon their receipt by the appellee payment thereof could be enforced against the appellants by the First National Bank of Chicago without claiming through the said forged indorsements but as the holders of negotiable paper made payable to bearer. In *Phillips* v. *Mercantile Nat. Bank,* 140 N. Y. 556, (23 L. R. A. 584,) the cashier of the Sumpter Bank drew drafts in its name against the Mercantile Bank to the order of various persons with whom the Sumpter Bank did business. He then indorsed the drafts in the names of the payees to the order of certain stock brokers, who collected them from the Mercantile Bank. It was held that the payees named in the drafts were in law fictitious persons, and the drafts, in legal effect, were payable to bearer. In *Snyder* v. *Corn Exchange Nat. Bank,* 221 Pa. 599, Snyder was a depositor in the bank and sued to recover the amount of certain checks alleged to have been wrongfully paid and charged to his account. The checks were drawn by a clerk employed by the plaintiff to the order of one Charles Niemann. The clerk then indorsed the name 'Niemann' upon the checks and delivered them to

R. M. Miner & Co., bucket-shop·men.  The name Charles Niemann was used by the clerk as that of a fictitious person.  The court said:  'The intent of the drawer of the check in inserting the name of the payee is the sole test of whether the payee is a fictitious person, and the intent of the drawer of these checks, as attorney for the appellant, must, as just stated, be regarded, as against the bank upon which they were drawn, as the intent of the appellant himself.'  The First National Bank did not, therefore, make out its title to said drafts through a forged indorsement, and appellants could not, therefore, recover back the money paid to the bank on said drafts."

No reference is made in this last decision of this court to the present Negotiable Instrument act, and counsel for both parties seem to concede that the court in that decision was attempting to lay down the general rule as to negotiable paper and was not construing the wording of our present Negotiable Instrument act, which had then but recently gone into force but which was not argued or considered in that case.

Counsel for plaintiff in error insist that the Appellate Court in construing the holding in the *Bartlett case, supra,* to be that "whenever an agent draws a draft not intending the payee to have an interest therein the draft is payable to bearer ·regardless of the agent's actual authority," misconstrued the real holding of this court in that case; that the *Phillips* and *Snyder cases* cited by this court or its holding in the *Bartlett case* are not authority for any such rule; that, in fact, those cases announce quite another rule, namely, that because the agents in such cases had been authorized to issue bearer paper, bearer paper in the form issued by them was binding on their principals; that if the language of this court in the *Bartlett case* must be taken literally and without reference to the· facts in that case, and if that language means what the Appellate Court in our case has held that it means, then it overrules and supplants

the rules laid down by the Negotiable Instrument act, and overrules, in effect, the former decisions of this and other courts in leading cases on this question. Counsel for the plaintiff in error further argue that the *Phillips* and *Snyder* cases, and other cases decided prior to the decision of this court in the *Bartlett case,* hold that the question whether an agent's intention that the payee shall have no interest in the instrument makes such instrument payable to a fictitious person, and hence payable to bearer, depends upon the authority of such agent; that if the authority of the agent is broad enough to authorize him to draw or make an instrument for his principal payable to a fictitious payee, his intention to make the instrument payable to a fictitious payee will be imputed to his principal because of his authority, but not otherwise. While it is true that the authority of the agents in the *Phillips* and *Snyder cases,* as well as in the *Bartlett case,* was broad enough, possibly, as stated in the opinions, to impute the intention of the agents to the principals, we do not read any of those decisions as laying down the doctrine contended for by counsel for plaintiff in error, and certainly that was not the understanding of this court in referring to and relying on those decisions in the *Bartlett case, supra.*

We cannot agree with counsel for plaintiff in error that none of the decisions referred to in the briefs lay down the rule as to a fictitious payee in a draft drawn by an agent as broadly as it is laid down by this court in the *Bartlett case, supra.* Without question, the same rule is laid down in the opinion of the court in the case of *Bank of England* v. *Vagliano,* Br. App. Cas. (1891) L. R. 107, also reported in 3 Eng. R. C. 695. This is one of the leading cases on this question in any jurisdiction and there were dissenting opinions. The opinions of the various judges discussing this question considered every phase of the problem raised in the briefs in this case. That decision reversed the judgment of the Queen's Bench Division and the judgment of the court

of appeals in the same case, which is found in L. R. 22 Q. B. Div. 103, and in *Vagliano* v. *Bank of England,* (on appeal,) L. R. 23 Q. B. Div. (1889) 243, which cases were cited and relied on by this court in *First Nat. Bank* v. *Northwestern Bank,* 152 Ill. 296. In the final decision in that case by the House of Lords it was held under their Negotiable Instrument act, which was worded practically the same on this question as our own act, that in deciding whether the payee was a fictitious or non-existent person the lower courts had wrongfully read into the provisions of the Negotiable Instrument act the words "with the knowledge of the acceptor;" that the part of the act where this clause occurs deals not with the liability of the acceptor but with the form and interpretation of the statute, and the knowledge of the acceptor had nothing to do with the matter; that the word "fictitious," as applied to the payee and to such persons in such cases under the act, should not be so construed as to be applicable only to a creature of the imagination, having no real existence; that the proper meaning of the word in the act was "feigned" or "counterfeit." Lord Herschell, one of the majority of the House of Lords, in his opinion said among other things (3 Eng. R. C. 730) : "Where the payee is a fictitious or non-existent person the bill may, as against any party who had knowledge of the fact, be treated as a bill payable to bearer. It seems to me that this is to add to the words of the statute and to insert a limitation which is not to be found in it or indicated by it. It is said that when the acceptor is the person against whom the bill is to be treated as payable to bearer 'fictitious must mean fictitious as regards the acceptor and to his knowledge.' With all respect I am unable to see why it must mean this. I confess I cannot altogether follow the meaning of the words 'fictitious as regards the acceptor.' I have a difficulty in seeing how a payee who is, in fact, a 'fictitious' person in the sense in which that word is being used, can be otherwise than fictitious as regards all the world; how such a

payee can be 'fictitious' as regards one person and not another.  *  *  *  It seems to me that to import into the statute after the words 'fictitious person' the words 'as regards the acceptor,' or drawer, as the case may be, and then to interpret those words as meaning 'to the knowledge of,' only tends to obscure," etc.  The opinion of this learned jurist also discussed the point that is made here by· counsel for plaintiff in error as to the right basis for the conclusion that the payee should be held fictitious as against the other parties, and there stated that estoppel is not the only sound basis for construing the law under the Negotiable Instrument act as to a fictitious payee, saying (p. 733) :  "Estoppel is not the only sound principle upon which a law can be based.  The law of estoppel was not thought to afford a sufficient protection to those dealing with the apparent owner of goods.  *  *  *  Why, then, should it be thought improbable that the legislature should have created in the holder of a bill drawn payable to a fictitious person a new right against the acceptor?  If I am correct in thinking that this added right would obviate and not entail injustice, that it would make the law more reasonable and bring it more into conformity with the course of commercial transactions, I can see no reason for doubting that the legislature so intended if this be the plain, natural meaning of the words they have used, or for endeavoring so to construe the language as to find in it no more than a statement of the previous law."  Again his opinion states (p. 736) :  "I have arrived at the conclusion that whenever the name inserted as that of the payee is so inserted by way of pretense, merely, without any intention that payment shall only be made in conformity therewith, the payee is a fictitious person within the meaning of the statute, whether the name be that of an existing person or of one who has no existence, and that the bill may in each case be treated by a lawful holder as payable to bearer."

The opinions, both those of the majority and those of the minority, in the case cited, demonstrate beyond question that counsel for plaintiff in error are wrong in saying that none of the well considered authorities have ever laid down the same rule as to fictitious persons as was laid down by this court in the *Bartlett case, supra.* We think the opinions in *Phillips* v. *Mercantile Nat. Bank, supra,* and *Snyder* v. *Corn Exchange Nat. Bank, supra,* fairly construed, lay down the same rule, as does also the opinion in *United States* v. *Chase Nat. Bank,* 241 Fed. 535, and, though not quite so clearly, the opinion in *Horstman* v. *Henshaw,* 11 How. 177. An examination of all these authorities, and the others cited in the briefs of both counsel, leads us to the conclusion that this court rightly laid down the law in *Bartlett* v. *First Nat. Bank, supra,* as construed by the Appellate Court in this case. This being so, it is unnecessary for us to consider or decide the other questions raised in the very able and exhaustive briefs of counsel for plaintiff in error.

However, we deem it not improper to state that there is merit in the argument of counsel for defendant in error that upon the pleadings and record in this case it can be fairly held that Meyer was the general agent or manager of plaintiff in error's business at Garber; that he was the only one authorized to represent it in that vicinity; that he was authorized to buy all the grain there that was to be bought for plantiff in error and to pay for such grain; that in paying for such grain he had authority to bind the plaintiff in error by drafts issued by him, which were in legal effect the promissory notes of the hominy company. (*Funk* v. *Babbitt,* 156 Ill. 408.) The special counts of the declaration allege that he had authority to buy grain and pay for it by drafts issued by him, and counsel for plaintiff in error concede that such drafts were, in effect, promissory notes binding upon plaintiff in error. If Meyer,

as its agent, was clothed with authority to execute and put into circulation promissory notes of the plaintiff in error, it would seem necessarily to follow that if he issued such drafts to persons who had sold no grain to him, and those persons had, in fact, indorsed the drafts to a *bona fide* holder and plaintiff in error refused to pay them, then such holder could have sued and recovered from plaintiff in error even though the latter had never received the grain. (*Hall v. First Nat. Bank,* 133 Ill. 234; *Huston v. Newgass,* 234 id. 285.) This being so, it is not unreasonable to hold that the drawing of these drafts by Meyer and indorsing them in the names of the fictitious payees, indorsing their names himself on the back, might be fairly considered within the scope of his authority as agent, as alleged in the declaration. There is no proof that he had been given any contrary instructions. A company is bound by the acts of its agent in the exercise of powers within the apparent scope of his authority unless special limitations upon his powers are brought to the notice of the party dealing with him. (*Phenix Ins. Co. v. Stocks,* 149 Ill. 319; *Phenix Ins. Co. v. Hart,* 149 id. 513. See, also, *Noble v. Nugent,* 89 Ill. 522, and 8 Corpus Juris, 776.) Therefore, even if it be conceded for the purposes of this case that the rule of law on the principal subject under consideration contended for by counsel for plaintiff in error should apply here, it must follow on this record that Meyer's intention as to the fictitious payee must be imputed to his principal because within the scope of his authority as agent, and for that reason also the judgment of the Appellate Court should be affirmed.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

CARTWRIGHT, C. J., and FARMER and DUNN, JJ., dissenting.