William A. Paine et al., Trading as Paine, Webber & Company, Appellees, v. Continental & Commercial National Bank of Chicago, Appellant.

Gen. No. 34,591.

Heard in the first division of this court for the first district at the October term, 1930. Opinion filed January 26, 1931.

Loucks, Eckert & Peterson, for appellant.

POPPENHUSEN, JOHNSTON, THOMPSON & COLE, for appellees; FLOYD E. THOMPSON, of counsel.

MR. JUSTICE MCSURELY delivered the opinion of the court.

In an action of assumpsit tried by the court, plaintiffs had judgment for $11,562.50, from which defendant appeals.

Although the respective briefs give considerable space to a recital of the pleadings, yet we are not asked to pass on any point arising on them. The declaration in appropriate language alleged that defendant was obligated for money had and received by reason of its payment of its cashier's check upon a forged indorsement. Defendant's liability, if any, must be determined upon this action.

The facts were stipulated as follows: Plaintiffs are partners engaged in the stock brokerage business in Chicago and elsewhere. Defendant is a banking corporation carrying on business in Chicago. December 15, 1926, and for a long time prior and subsequent thereto plaintiffs maintained a checking account with defendant, carrying on numerous banking transactions. During this time plaintiffs had in their employ in the Chicago office Joseph J. Collum as assistant cashier, whose duty it was to draft and receive checks on behalf of plaintiffs, enter the same upon the books and perform the usual duties of a cashier. He had no authority to draw checks for plaintiffs except to pay their obligations. No check drawn and signed by Collum was valid until it had been signed either by the resident partner or the office manager or Walter Brunton, the head bookkeeper of plaintiffs at the Chicago office. Brunton usually signed more than a hundred checks a day. The checks were drawn on the defendant bank, which had instructions to honor such checks. Collum also had authority to give directions

in the name of plaintiffs to defendant to issue its cashier's checks.

December 15, 1926, Collum drew a check on plaintiffs' account with defendant, payable to the order of defendant, for $10,000, and signed the same and presented it along with other checks to Brunton for signature. Brunton signed the check. Collum thereupon sent the check by messenger to defendant bank with a written requisition in the name of plaintiffs for a cashier's check in the sum of $10,000, payable to the order of George Halas, a man in business in Chicago and a customer of plaintiffs. Brunton at this time did not know that Collum was acting dishonestly and did not know that the check was to be used for any other purpose than the payment of an obligation of plaintiffs. Brunton made no examination of his books to ascertain the facts as to the Halas account but relied on Collum's representations concerning the same. The facts were that on that date plaintiffs were not indebted to Halas and did not know of Collum's intention to purchase the cashier's check. Defendant accepted the check in the regular course of business and charged it to plaintiffs' account and in consideration of the sum therein mentioned, $10,000, executed and delivered to plaintiffs' messenger its cashier's check for $10,000, payable to the order of George Halas. None of defendant's officers had any knowledge of Collum's secret intention to use said check for his own private purposes. This cashier's check was never delivered to Halas.

When the messenger returned to plaintiffs' office with the cashier's check, it was given by Collum without the knowledge, consent or approval of any of plaintiffs and indorsed by Collum as follows: ''Pay to order of George Gottschalk—George Halas'' and was sent by Collum to Gottschalk at Los Angeles, California. Upon receiving same Gottschalk indorsed it to John C. Feys & Associates, Inc., who were stock

brokers of Los Angeles, California. The check was sent by Collum through Gottschalk, without the knowledge of plaintiffs, to be applied and the same was applied by Feys & Associates as required margin on an account that was then being carried on by Collum in the name of Gottschalk with Feys & Associates.

December 27, 1926, defendant paid the amount of said cashier's check to the holder thereof. It bore the indorsement above stated and the subsequent indorsements of John C. Feys & Associates, Inc., and others. Defendant now has possession of the cashier's check. George Halas never had possession of it nor any interest in it and has received no part of the proceeds of same. Plaintiffs have never delivered said cashier's check to anyone for any purpose and have received no part of the proceeds thereof.

About June 1, 1927, plaintiff discovered the theft of the cashier's check and thereupon notified defendant that said check had been stolen from them and had not been delivered to nor indorsed by Halas and called upon defendant to repay said sum of $10,000 paid by plaintiffs to defendant for the cashier's check, which defendant refused to do.

From December 1, 1926, to July 1, 1927, defendant rendered monthly statements to plaintiffs showing all deposits made by plaintiffs and all checks drawn against their account and with such statements returned to plaintiffs the cancelled checks. This included the check of plaintiffs for $10,000, dated December 15, 1926, with which the cashier's check was purchased.

During all the time between November 1, 1926, and May 14, 1927, Collum was a trusted employee of plaintiffs and none of them had any knowledge of his unfaithfulness. About May 14, 1927, while plaintiffs' books were being audited, Collum voluntarily confessed to one of the resident partners of plaintiffs that he had embezzled large sums of plaintiffs' funds during the past year and that he had for a time success-

fully concealed his defalcations by manipulating the records and accounts of plaintiffs. Prior to June 1, 1927, none of plaintiffs had any knowledge of the purchase of the cashier's check on December 15, 1926, payable to George Halas, and did not know that Collum had indorsed this with the name of Halas nor the use he had made of it nor that defendant had paid said check. Immediately upon discovering the facts plaintiffs notified defendant by letter and demanded payment. It being refused, this suit was commenced July 30, 1927.

Collum confessed that he had embezzled a total amount of over $100,000, and offered to make restitution so far as he was able to do so, and thereupon delivered to plaintiffs certificates of stock in the Julian Petroleum Corporation. Plaintiffs had no knowledge of the existence of Collum's account with John C. Feys & Associates. When the certificates of the Julian Petroleum Corporation were delivered to plaintiffs by Collum, the shares were of unknown value and there was no market for them. Shortly thereafter the Julian Petroleum Corporation was placed in the hands of a receiver and new shares of stock were issued, plaintiffs exchanging the shares they had received from Collum for new shares. At this time plaintiffs knew that the cashier's check had been used by Collum to pay his obligations to John C. Feys & Associates. The actual value of the new shares of stock is unknown and its market value is continually fluctuating, although it was agreed that at the time of the stipulation its market value was approximately 15c a share. Plaintiffs' unrecouped losses as a result of Collum's embezzlement still exceed $100,000.

Objections to certain paragraphs of the stipulation as irrelevant and immaterial were made by respective counsel, but we have set forth virtually all the facts contained in the stipulation.

Defendant first asserts that the cashier's check was payable to bearer and hence it properly paid the same, regardless of the validity of the indorsement. Section 9 of the Negotiable Instruments Act (Cahill's Illinois Statutes, paragraph 29, chapter 98) provides:

"The instrument is payable to bearer: . . . When it is payable to the order of a person known by the drawer or maker to be fictitious or non-existent or of a living person not intended to have any interest in it."

It is conceded that George Halas, the payee in the cashier's check was a "living person not intended to have any interest in it."

The statute provides that an instrument is payable to bearer when "the drawer or maker" knows that the payee is fictitious or non-existent or a living person not intended to have any interest in it. It is the intention of the maker of the instrument which controls its character with respect to whether or not it is payable to bearer.

This is the uniform construction of this statute. In *National Surety Co. v. Halsted Street State Bank,* 246 Ill. App. 92 (writ of certiorari denied by the Supreme Court), the agent of an Insurance company caused drafts to be issued by the company to policyholders in payment of fictitious claims and instead of delivering them to the payees forged indorsements of the payees and procured the payment of the drafts by the bank. It was held that the fact that the agent did not intend to deliver the drafts to the payees but intended to use them in his own behalf did not make the payees fictitious within the meaning of the Negotiable Instruments Law, for the drawer of the drafts, the Insurance company, assumed that the fictitious claims were genuine and that it was intended that the payees and no one else should receive the proceeds of same. In *Grand Lodge v. Emporia National Bank,*

101 Kan. 369, under somewhat similar circumstances, where a certificate was drawn payable to a fictitious beneficiary, it was held that the plaintiff did not know that the payee was a fictitious person but supposed she was an existing person and issued the order to that person, the opinion saying:

"When a negotiable instrument is knowingly issued to a fictitious person it is payable to bearer, because there is no one to endorse it; but when such an instrument is issued to a person supposed to be in existence, it is not knowingly issued to a fictitious person. When the instrument is not knowingly issued to a fictitious person it must be endorsed by the person to whom it is issued."

To the same effect is *National Union Fire Ins. Co. v. Mellon Nat. Bank,* 276 Pa. 212, where there is an extensive review of the authorities, the court holding that the fictitious persons "must be known to the drawer of the drafts to be such, before the result contended for could operate on the instruments." In *McCornack v. Central State Bank,* 203 Ia. 833, 211 N. W. 542, it was contended that, as the payees had no interest in the checks involved, they were payable to bearer. The court held otherwise, saying that a check payable to the order of a fictitious person with the knowledge of the drawer is payable to bearer, but: "Where the fact that it is payable to a fictitious person is unknown to the drawer, the bank upon which it is drawn, on paying it, is in no different position than where it pays a check payable to a real party upon a forged indorsement."

In *American Express Co. v. Peoples Savings Bank,* 192 Ia. 366, it was held that, where drafts were drawn to the order of a fictitious person, but the drawer did not know this, the drafts would not be payable to bearer. The intention of the drawer is the test. These and many other cases which might be cited concur in holding that, where the drawer of the draft does not

know that the payee is fictitious or one who has no interest in the check, such check is not payable to bearer.

In the instant case it is manifest that defendant had no intention to issue its cashier's check payable to a person who had no interest therein. It must be presumed to have believed that George Halas, the payee, was interested in the proceeds of the check and was entitled to the same. It had no knowledge to the contrary, and therefore its check cannot be construed as payable to bearer.

Defendant's cited cases do not conflict with this rule, but are different in the facts. A typical case is *American Hominy Co. v. National Bank of Decatur,* 294 Ill. 223, where the unfaithful agent drew the drafts, not intending that the payees should have any interest therein, and himself forged the indorsements, and it was held that the plaintiff was estopped to deny the authority of its agent who was clothed with general powers. The language of the opinion recognizes the distinction between knowledge of the drawer of the instrument and lack of knowledge.

Defendant's position seems to be that, because Collum had a secret intention to use plaintiff's check improperly in purchasing a cashier's check payable to a person who had no interest in the cashier's check, this secret intention in some way is the knowledge of defendant in issuing its cashier's check. We can see no legal connection between the acts. The situation would be just the same if Collum had improperly taken cash from the plaintiff's funds and bought the cashier's check with the same. It is immaterial how the cashier's check was purchased. Nothing that was done in issuance of plaintiff's check payable to the defendant had any legal connection with the payment by defendant of its cashier's check on a forged indorsement. A similar situation arose in *Seaboard National Bank v. Bank of America,* 193 N. Y. 26, where the agent used

a check of the firm employing him to purchase a New York draft payable to the order of an existing firm but one which the agent intended should have no interest in the draft. It was, there specifically held that the fraudulent act of issuing the check with which to purchase the draft was wholly unrelated to the improper act of the bank in paying its draft upon a forged indorsement; that there was no legal connection between the two transactions.

Considerable argument is presented with reference to the authority of Collum. It may be admitted that, when he ordered the cashier's check he did not pretend to order it for himself but for the plaintiffs, and that defendant knew that he had authority to use plaintiffs' funds for the use of plaintiffs. The purchase of the cashier's check was wholly within the scope of Collum's authority. Defendant could not be expected to know as to the account between plaintiffs and their customer, Halas, and whether or not such account showed a balance due Halas was immaterial so far as defendant was concerned.

There is no merit in defendant's claim that the loss was occasioned by plaintiffs' negligence in not earlier discovering Collum's defalcations. For aught that appears to the contrary, the first wrongful act done by Collum was his fraudulent representation which induced Brunton to sign plaintiffs' check for the purpose of securing the cashier's check from defendant. There is no evidence that the prior payments made by Collum to Feys & Associates were improperly made. The most that the stipulation shows is that certain payments were made, although the year is not given, but where the money was procured with which Collum made such payments does not appear.

It is said that plaintiffs ratified the acts of their employee, Collum, by claiming title to the cashier's check. We do not agree with this. We repeat, plaintiffs cannot complain of the purchase of the cashier's

check. They must be held to have purchased it and thereby became the owners of it; but, because the principal may be held by one act of his agent, he is not obliged to adopt a wrongful act for which he is in no way responsible. *Independent Oil Men's Ass'n v. Fort Dearborn Nat. Bank.,* 311 Ill. 278. In *Morris & Bailey Steel Co. v. Bank of Pittsburgh,* 277 Pa. St. 81, 120 A. 698, the court said: "We must assume Leder (the agent) had authority to draw and deliver the original checks in favor of plaintiff and, as the cashier's checks issued in lieu of them were intended for plaintiff, it had a right to ratify the action of Leder up to the time he received them. This did not operate as a ratification of his subsequent wrong in indorsing the checks, his conduct in this respect being repudiated both before and by this suit." To the same effect are *Farmer v. People's Bank,* 100 Tenn. 187; *Robinson Machine Works v. Vorse,* 52 Ia. 207.

When plaintiffs accepted the Julian Petroleum Corporation stock from Collum in partial satisfaction of his defalcations, they had no knowledge that he had stolen the cashier's check and had forged the indorsement of the payee, thereby using it to discharge his obligation to John C. Feys & Associates in connection with the purchase of stock. It was not until two weeks after the certificates of stock were delivered to them that they learned of the purchase and use of the cashier's check. The record shows that the value of the stock turned over to them does not appreciably make good the losses suffered by Collum's defalcations.

Feys & Associates were not holders in due course. They could not have collected against the bank, if the bank had discovered that the payee's name was forged and had refused payment for this reason. Feys & Associates' remedy would be against Gottschalk, the prior indorser, and it is reasonable to presume that defendant has its recourse against the prior indorsers.

Defendant did not render a statement to plaintiffs between the time the cashier's check was purchased and the time it was cashed, so that plaintiff had no opportunity to know the facts of the transaction until long afterwards. Furthermore, such statements would not have disclosed the payment upon the forged indorsement.

Reduced to its simplest elements, this is a case where the defendant issued its cashier's check payable to a certain payee who, as far as the bank knew, was interested in its proceeds. In due time the check was returned to the bank for payment with a forged indorsement of the name of the payee. Without making any inquiry as to the genuineness of this indorsement the bank paid the check. While counsel have extensively argued and presented numerous decided cases, the view we take of the essential elements of the case leads inevitably to only one conclusion, namely, that the plaintiffs' loss was occasioned by the mistake of the bank in paying the check. Under such circumstances the bank must make good the loss. The judgment is therefore affirmed.

*Affirmed.*

MATCHETT, P. J., and O'CONNOR, J., concur.