McCANN STEEL COMPANY, INC., v. THIRD NA-
TIONAL BANK IN NASHVILLE, TENNESSEE. —
337 S. W. (2d) 886.

Middle Section at Nashville. April 29, 1960.

Certiorari Denied by Supreme Court September 9, 1960.

Claude Callicott, Nashville, for complainant.

Thomas M. Evans, John D. Mosby, Nashville, for defendant.

HUMPHREYS, J. This is an appeal from a decree of Part Two of the Chancery Court of Davidson County, in favor of appellee McCann Steel Company, Incorporated, against Third National Bank in Nashville, Tennessee, for $2,108.81, and costs. Upon pleadings raising the issue, the Chancellor found the Bank had paid this amount out of a bank account in which the Steel Company owned a beneficial interest, upon forged endorsements on checks drawn on said account, without negligence on the part of the Steel Company. From this decree the Bank has appealed and assigned errors.

The Chancellor has made a full and complete finding of facts which, after our reading and study of the record, we do not find to be contrary to the preponderance of the evidence, and which we therefore adopt, and here set forth:

"That during the years 1955 and 1956 complainant was awarded contracts by Monsanto Chemical Company by which it obligated itself to furnish all the labor, material and equipment necessary to fabricate and erect all structural steel on certain foundations of Monsanto Chemical Company in accordance with certain drawings.

"Compainant was a non-union contractor, and it was necessary for the erection of said steel to be done by union labor. This made it necessary for complainant to sublet erection of the steel to an independent contractor who would employ union labor, and accordingly, on December 2, 1955, it entered into a written contract with an independent contractor, Robert A. Hall, doing business as Middle Tennessee Erection Company, by which he obligated himself to erect said steel on a cost plus basis. The written contract related to one purchase order from Monsanto Chemical Company to complainant, but subsequently the terms of the written contract were verbally extended so as to apply to another job of complainant with Monsanto Company, and to the completion of a job at Russellville, Kentucky.

"Robert A. Hall had, over a period of several years, worked intermittently for complainant, sometimes as a foreman, but at no time had he possessed or exercised authority to issue, sign or negotiate checks or other commercial paper for complainant for any purpose whatsoever. At various and sundry times he had in prior years, as an independent contractor engaged in the erection of steel, but not for complainant.

"The said Robert A. Hall was a man of good reputation. He had made complainant a trustworthy, dependable employee, and conplainant entered into the contracts

with him in good faith and without negligence, justifiably believing that he was an honest man. The written contract between complainant and Hall was filed as Exhibit No. 1 to the testimony of John H. McCann, president of complainant. By this contract, Robert A. Hall, doing business as the Middle Tennessee Erection Company, agreed to erect, in accordance with applicable specifications and in a workmanlike manner, the structural steel on said Monsanto Chemical Company job, to carry workmen's compensation and public liability insurance, and to furnish all labor and do all the work on same. Complainant agreed to pay said Erection Company on a cost plus basis, that is, it agreed to pay said Erection Company for all the costs of labor, insurance, taxes, equipment and miscellaneous supplies and expenses, and certain monies in addition thereto.

"The written contract between complainant and Hall contained the following paragraph with respect to a bank account:

" 'To facilitate the execution and performance of this contract the parties hereto agree that a bank account shall be opened in the Third National Bank, in the name of Middle Tennessee Erection Company, deposits therein to be withdrawn only on checks signed by both Robert A. Hall and M. C. Dabney, that McCann Steel Company will make weekly deposits in said account, the same to be credited on its obligation in this contract to said Erection Company, and that checks shall be written on said account to pay for all labor used in the performance of this contract, and for such other costs and expenses as McCann Steel Co., Inc., has obligated itself to pay for

under this contract, and when all such costs and expenses have been fully paid for, any balance remaining shall be paid to McCann Steel Company, Inc.'

"Robert A. Hall, in the performance of said contracts with complainant, was an independent contractor. He selected his employees, exercised supervision over them, paid the privilege taxes imposed upon contractors, carried workmen's compensation and public liability insurance as such contractor, and had actual charge and supervision of the erection of the steel on said job. Complainant looked to said Hall for results only, and from time to time did inspect the job so as to see that it was being done in accordance with contractual obligation. Hall was not an agent of complainant.

"For many years complainant has done its banking with the defendant Bank, carrying a checking account in said Bank, and also borrowing large sums of money from time to time from said bank. Various and sundry officials of the defendant Bank had represented the Bank in its business relations with complainant, however at the time of the matters involved in this litigation, and for some time prior thereto, the official of the defendant bank who was principally in charge of the bank's business with complainant was G. A. Puryear, Vice President. The said Puryear, and other officials of said Bank, were personally and well acquainted with John H. McCann, President of complainant, and also with M. C. Dabney, who was Assistant Secretary of Complainant, who had general charge of complainant's bookkeeping, and who did a lot of the banking business with defendant bank for complainant, making deposits and discussing very frequently, at least once a week, loans and other matters with Puryear of said bank.

"After complainant was awarded the contract by Monsanto Chemical Company, its President, John H. McCann, so informed G. A. Puryear, and arranged with him to borrow funds from said Bank to finance said jobs. The president of complainant further informed G. A. Puryear that on account of the union labor situation, it was necessary for his company to sub-let the erection of said steel to an independent contractor. It does not appear that G. A. Puryear actually saw the written contract between complainant and Hall, but he was informed that such contract was being entered into, and complainant's president at the time stated to him that a new bank account would be opened in the defendant bank for the purpose of handling the financial operations of the jobs in question in so far as the contracts for the erection of the steel were concerned, and that the signature of a representative of complainant would be required on all checks.

"Within a very short time thereafter said bank account was opened on December 5, 1955. The account was opened by M. C. Dabney, as a representative of complainant, in the name of Robert A. Hall, doing business as Middle Tennessee Erection Company. The signature card bore a notation that the two signatures required were those of Robert A. Hall and M. C. Dabney. The business address was given as 106 Boscobel Street, P. O. Box 1203, telephone Alpine 5-7694. The address and telephone number given was known by defendant to be that of complainant. The signature cards bore the notation, 'brought in by M. C. Dabney, McCann Steel.' The initial deposit in said account was made on December 5, 1955, the last deposit was made on November 29, 1956, and the account was closed on December 7, 1956. All

deposits in said account consisted of checks drawn on the bank account of complainant in the defendant Bank, payable to Middle Tennessee Erection Company, and the checks were endorsed for deposit by said Middle Tennessee Erection Company by means of a rubber stamp. The deposits in said account were made by a representative of complainant, and in almost every instance by M. C. Dabney, until he resigned and was succeeded by Hampton Lackey as said representative of complainant and then by Lackey. An examination of the checks which were deposited in said account reveals the purpose of same, some of them bearing notation 'payroll' and some were made for the cost of insurance and other expenses.

"Robert A. Hall furnished complainant with the names of his employees, their social security numbers, and the number of dependents, and the wage rate of said employees. He also furnished complainant daily reports showing the name of each of his employees and the number of hours worked by each. Complainant's representative computed the amount due each employee and checks were issued weekly, made payable to said employees for the wages due each of them, based upon said reports and other information furnished. M. C. Dabney signed said checks until he was succeeded by Hampton Lackey and then they were signed by Lackey. Said checks were then given to Hall, for his signature and for delivery to said employees.

"All of the payees named in the checks involved in this suit were real persons and none of them was a fictitious person. With the possible exception of Tom Norris, all of said employees actually worked for Middle Tennessee Erection Company on one or more of the jobs covered by

the contract between complainant and Hall, and Norris had worked on the job at Russellville, Kentucky either as a direct employee of complainant, or later for Middle Tennessee Erection Company, after the company took over the completion of said job as an independent contractor with complainant. Complainant's representatives, Dabney and Lackey, in signing said checks acted in good faith, believing in each instance that the named payee was entitled to be paid the amount of such check, and intending that such named payee actually receive the proceeds of said check.

"During the period of time in question Robert A. Hall made up many false reports with respect to the time worked by various and sundry employees, and in this manner caused checks to be issued payable to said employees purportedly paying them for their labor when in fact no such labor had been performed, for which such checks were issued. He then took said checks and forged the endorsements of the payees, and in this manner personally cashed said checks with forged endorsements and used the proceeds thereof for his own personal uses and for purposes in no manner connected with the subject matter of his contracts with complainant. Complainant has sued the defendant bank on 32 of such checks totaling in amount $2,108.81, which are listed in the original bill.

"Within a reasonable time after it was discovered that the endorsements on some of the checks had been forged by said Hall, Hampton Lackey notified G. A. Puryear by telephone. A prompt investigation was made by complainant. Robert A. Hall executed an affidavit admitting said forgeries and written notice was then given of said forged endorsements to the defendant bank

by the attorney for complainant. None of the officers or employees of complainant participated in or had any knowledge of the forgeries by Robert A. Hall until a short time before the bank was notified. Therefore, the Court finds that both oral and written notice of said forgeries was given by complainant to the defendant bank within a reasonable time.

"The defendant bank had actual and constructive knowledge of the purposes for which said bank account was opened. It knew that Robert A. Hall did not have exclusive control of said account and complainant had an interest therein.

■■ "A bank is liable for money paid out of a bank account on checks upon which the endorsements have been forged, unless those interested in the account are guilty of negligence or have breached a duty owed the bank. However, the complainant, who had an interest in the bank account, did not breach its duty to the defendant bank, nor was it guilty of negligence which caused the bank to pay the checks upon which the endorsements had been forged. Therefore, the exception to the rule does not apply. It is presumed that the said payments were made by the defendant bank out of its own funds and not out of the account in which the complainant had an interest, therefore the complainant has suffered loss and damage in the amount of $2,108.81."

■■ The general rule of law relied on by the Steel Company as a basis for its recovery, and applied by the Chancellor, is stated in Pollard v. Wellford, 99 Tenn. 113, 42 S. W. 23, as follows: that a bank must, at its peril, pay a check to the actual payee or upon his genuine endorsement; and, if it fail to do so from mistaking

the identity of the payee, or by paying upon a forged endorsement, it is responsible for the loss. Again, in Figures v. Fly, 137 Tenn. 358, 193 S. W. 117, the rule stated that if a drawee bank pays a check to which the payee's name is forged as endorser, the payment is deemed to be made out of its own funds, not the depositor's provided the latter has not been guilty of negligence, or fraud that misled the bank. This rule of the common law has been enacted into the statute law of our State by sec. 47-123, T. C. A. United States Guarantee Co. v. Hamilton Natl. Bank, 189 Tenn. 143, 223 S. W. (2d) 519. There are certain exceptions and qualifications of this general rule, upon which the bank relies, which we will discuss at the time we consider the assignments of error based thereon.

▮ The first assignment is that the Chancellor erred in finding and holding that the Steel Company owned an interest in the bank account and that the Bank had actual and constructive knowledge thereof. This assignment is based on the propositions (1) that the facts of the case do not show that the Bank did have actual or constructive knowledge that the Steel Company owned an interest in the bank account, and, (2) that there were certain deposit contracts executed between the Erection Company and the Bank which the Bank contends must define and control rights to the account and that under these contracts the Steel Company had no interest in the bank account.

▮▮ With respect to the first basis of this assignment we are constrained to agree with the Chancellor's holding that in view of all the facts and circumstances of the case, the Steel Company actually did own a beneficial interest in said account, and this was known to the Bank, and overrule the first basis of this assignment. In view

of this, and this being a suit in equity, we must, as the Chancellor did, with respect to the second basis of this assignment, apply the equitable maxims, ''Equity regards that as done which in good conscience ought to be done,'' and, ''Equity looks to the intent rather than to the form''. Under these maxims and principles of adjudication it was the duty of the Chancellor, as it is ours, to decide the rights of the parties upon the basis of the actual facts and circumstances and conditions surrounding the entire transaction, and from these determine the true knowledge and intention of the Steel Company, the Bank, and the Construction Company with respect to this account. When this is done, we must reject the contention of the Bank that the contracts of deposit control. This is especially true since the contracts do not purport to bind the Steel Company or define the relationship of the Steel Company and the Bank. In 9 C. J. S. Banks and Banking sec. 285, it is laid down as a general rule, that while the right to the return of the deposit or its equivalent presumably belongs to the person in whose name it is made, this presumption is rebuttable and the form of the deposit is not conclusive. Moreover, there is no statute or rule of law which we have been able to find which prevents a court of equity from looking into and determining the true intent and the actual equitable relationship of the parties under the existing facts with respect to a bank deposit. In other words, there is no rule that a contract of deposit, to which all of those interested are not parties, will be held as controlling. On the basis of the foregoing we overrule the first assignment of error.

The second assignment of error is that, if in fact the Steel Company did have a beneficial interest in the Bank account and this was known to the Bank, in any

event Hall was the agent of the Company for the disbursement of these funds and his act in forging endorsements on checks drawn on said account would amount to such negligence on the part of the Steel Company as would prevent recovery. We must overrule this assignment of error since the Chancellor found, and we do not find the preponderance of the evidence to be to the contrary, that under the facts of the case, Hall was not the Steel Company's agent for the disbursement of these funds. We find, as did the Chancellor, that Hall was an independent contractor in the construction work undertaken, and that in making out the payroll of employees as required by the contract, Hall was acting for himself. In depositing money in the beneficially owned account, the Steel Company was acting for itself in accordance with the contract. In making out payroll checks the McCann Steel Company was carrying out a contract obligation in which it was not acting as a principal of Hall, nor was it or any of its employees subordinated to the status of agent of Hall. These acts were done pursuant to a contract between Hall and the Steel Company which declared what should be done, without undertaking to define the status of either party on that account. We cannot find in the contract anything which requires that either party be considered as the agent of the other in the discharge thereof.

Moreover, a close examination of the facts fails to reveal that the Bank ever regarded Hall as the agent of the Steel Company or the Steel Company as the agent of Hall, or that it ever dealt with either of these parties on this basis. This being the view we take of the agency relationship contention, we necessarily overrule the second assignment of error.

The Bank's third assignment of error is that the Steel Company's negligence in not taking adequate precaution against Hall's payroll padding is the proximate cause of the loss, and on this account the Steel Company cannot recover. The Bank argues that it is utterly inconceivable that the Steel Company could have allowed this loss to occur, and that it could have been prevented by the most elementary investigation. This, of course, is true. However, the answer to this argument is that the obligation in the first instance of making certain that the checks were paid to the persons to whom they had been issued, and not upon forged endorsements, rested upon the Bank under the rules set forth above, not upon the Steel Company. If the Bank had discharged its duty with respect to the very first one of this series of checks, Hall's career as a forger would have been cut short at the outset, and his loss never would have occurred. The Bank cannot shift its primary responsibility, imposed upon it by a law based upon a necessary policy, unless it can point to some act on the part of the Steel Company which caused the Bank to act as it did. In this connection we hold, as did the Chancellor, that the counter-signature of the Steel Company's officer or employee on a check payable to a person who had from time to time worked in steel construction for both the Steel Company and the Erection Company, did not amount to an assurance to the Bank that the check presented to it for payment had in fact been endorsed by the true payee, and cause the Bank to pay the check. In view of the rule of law making a bank liable for payment of a check upon a forged endorsement, and in view of the sound policy upon which this law rests, we cannot hold the failure of the Steel Company to discover Hall's felonies was the moving

fault, but must hold the paying of the check on the forged endorsement to be that fault, and on this account overrule the third assignment of error.

The Bank's fourth assignment of error is that since the Steel Company entrusted the final execution, negotiation and delivery of these checks to Hall, it cannot now be permitted to recover. This assignment of error is based on the proposition that the Steel Company ''entrusted'' the final execution, negotiation and delivery of the checks in question to Hall. Since we have already found that this was not the case and that each party was acting for himself or itself under the contract, we cannot sustain this assignment of error. Moreover, the case upon which the assignment is predicated, Litchfield Shuttle Co. v. Cumberland Valley Natl. Bank, 134 Tenn. 379, 183 S. W. 1006, does not in our opinion justify or require that the assignment be sustained. In that case the manager of the corporation's branch business, with authority to draw checks in its name on the bank account which it kept for such branch businesses, drew checks thereon payable to persons with whom it had business dealings, forged their endorsements thereon, and then procured the money thereon either directly from the bank or by negotiating them to others. The Court held the bank was not liable to the corporation for the money so paid out because it was misled by the fault of the drawer, and, upon the further rule, that where the facts and circumstances amount to a direction from the owner of the bank account to pay the same without reference to the genuineness of the endorsement, which would be the case where the owner of the account through its agent or employee committed the forgery, the bank may charge the payment on such forged endorsements to the owner's bank account.

In support of this assignment of error the Bank also relies on United States Guarantee Co. v. Hamilton Natl. Bank, 189 Tenn. 143, 223 S. W. (2d) 519. But in this case, as in the Litchfield Shuttle Co. case, since the forgeries were committed by an employee of the depositor who was acting within the scope of her apparent authority when she made out the fraudulent checks and presented them to the manager of the company for his signature, the company was guilty of such negligence as prevented its recovery. In the present case, as we have already pointed out, the Steel Company and Hall were each acting separately, and there was no such agency relationship between them as to make the act of Hall the act of the Steel Company and the only possible ground for holding that the Steel Company was negligent would be on account of its failure to examine the paid checks to ascertain if the endorsements thereon were genuine. As to this, it is the general rule there is no duty on the depositor to "scan the indorsements to ascertain if they are genuine" because "a depositor has no greater knowledge as to the bona fides of the indorsements than has the bank". Darling Stores, Inc. v. Fidelity Bankers Trust Co., 178 Tenn. 165, 156 S. W. (2d) 419, 422; United States Guarantee Co. v. Hamilton Natl. Bank, supra. This assignment is overruled.

The fifth assignment of error is that as a matter of law, since all of the payees involved were fictitious, the checks were payable to bearer, and no endorsement was required. This assignment is based on a principle of negotiable instruments law discussed in Tennessee Products Corp. v. Broadway Natl. Bank, 25 Tenn. App. 405, 412, 158 S. W. (2d) 361. This rule is that as against a bona fide holder, where a note, bill, or

check, containing all the evidence of negotiability is knowingly made payable to the order of a fictitious person, the instrument becomes negotiable without endorsement, and is to be treated as if in terms made payable to bearer. The maker's intention is the controlling consideration which determines the character of such paper. It cannot be treated as payable to bearer unless the maker knows the payee to be fictitious and actually intends to make the paper payable to a fictitious person. In the Tennessee Products Corp. case, supra, wherein this rule was applied, the authorized agent of the corporation issued drafts payable to the order of persons who had no interest in the drafts and who were not intended by the agent to receive them. Some of the payees were fictitious and none of them had any interest in the drafts. The opinion goes on to hold that the act and intent of the agent in making drafts so payable was the act and intent of the corporation so the drafts were payable to bearer under the negotiable instruments act and under the principle of law just above set forth. However, it will be immediately observed that an indispensable element of the rule made the basis of the adjudication in that case is absent in the present case, and that is, in the present case Hall was not acting as agent for McCann Steel in the issuance of the checks and thus his act was not the act of the Steel Company. So, the indispensable ingredient of intention on the part of the drawers of the check, the Steel Company and Hall, to make the same payable to a fictitious person is absent.

In 7 Am. Jur., Bills and Notes, sec. 95, the fictitious payee rule is discussed and there it is made abundantly clear that a negotiable instrument made to a fictitious person cannot be treated as payable to bearer and nego-

tiated without endorsement unless the person making it knows and actually intends to make the instrument payable to a fictitious person. No such intent can be found in this case on the part of McCann Steel Company.

 This appeal has been ably briefed and argued by both parties. The Bank has contended forcefully that the Steel Company suit should be dismissed because of its alleged negligence in the premises, and, its arguments appeal to one's reason. However, when the contentions are weighed in the light of the facts and in the light of the two well-established rules (1) that ordinarily a banker on whom a check is drawn must ascertain at his peril the identity of the person named in the check as payee, and that it is only when he is misled by some negligence or fault of the drawer that he can set up his own mistake in this particular against the drawer, and secondly, that as a general rule there is no duty imposed upon a depositor to examine his cancelled checks to ascertain the genuineness of the endorsements thereon, it appears to us the Bank's appeal must be denied. The first and primary fault in the case, the reason that Hall was able to continue in his career of crime as long as he was, lies in the fact that the Bank did not ascertain the identity of the person named in the check as payee and paid upon a fraudulent endorsement. It seems to us that while there are exceptions and their application to this case have been forcefully and skillfully argued, they do not apply so as to take the case out from under the general rule. Accordingly, the assignments of error are overruled and the decree of the Chancellor is affirmed with costs.

Hickerson and Shriver, JJ., concurring.