TENNESSEE PRODUCTS CORPORATION v. BROADWAY NAT. BANK.—158 S. W. (2d) 361.

Middle Section.   August 2, 1941.

Rehearing denied October 11, 1941.

Petition for Certiorari denied by Supreme Court, February 7, 1942.

Armistead, Waller, Davis & Lansden and Trabue, Hume, Davis & Gale, all of Nashville, for appellant.

James A. Newman, of Nashville, for appellee.

FELTS, J. The Tennessee Products Corporation had a wood distillation plant at Lyles-Wrigley, Hickman County, Tennessee, where it produced charcoal, acetic acid and methanol. In this it used large quantities of cordwood. Its agent to buy the wood was J. C. Eakle. He would pay for it by issuing sight drafts on the corporation, payable to the order of the sellers at the American National Bank at Nashville, where the corporation kept its bank account; and on

arrival of the drafts it would pay them by giving its check to the bank. A sample of the form of these drafts is as follows:

"TENNESSEE PRODUCTS CORPORATION
Chemical Wood Department

No. N-104

Oct. 8   1937

At Sight Pay To The Order Of

B. N. Leamon                                              $305.62

Payable through AMERICAN NATIONAL BANK, Nashville, Tenn.
Three Hundred Five & 62/100                        DOLLARS

For value Received, and Charge to Account of
TENNESSEE PRODUCTS CORPORATION)   Timber Department
Nashville, Tennessee)   (Signed) J. C. Eakle
Inspector"

Attached to each draft was a voucher to show for what the draft was issued. There were blanks to be filled up, showing the name of the seller, hauler or cutter, the quantity of wood, the price of it and the price for hauling and cutting, etc. Eakle would fill in these blanks so as to show in detail the purpose for which the draft was issued.

He was a customer of the Church Street Branch of the Broadway National Bank at Nashville. Between January 29, 1937 and October 16, 1937, he negotiated 100 of these drafts at this bank. Each of them appeared to have been endorsed in blank by the payee and Eakle likewise endorsed them. The bank cashed some of them and placed the rest of them to his credit in his personal account, which he later withdrew on his checks. The bank endorsed each of these drafts, "Prior endorsements guaranteed," presented them and received payment of them through the American National Bank from the Tennessee Products Corporation.

About the time the Tennessee Products Corporation paid the last of the drafts its officers found a shortage of cordwood and discovered that Eakle had not issued these drafts for the purposes shown on the vouchers, but had fraudulently issued them by falsely filling in the vouchers, making the drafts payable to persons to whom the Tennessee Products Corporation was not indebted, forging endorsements of the payees, and negotiating the drafts on his own behalf. Thereupon the Tennessee Products Corporation notified the Broadway National Bank and called on the bank to pay back the amount of the drafts, $40,944.68 less $2,733.97, which Eakle had paid out of his own funds for wood, or $37,760.71. The bank denied liability, and the Tennessee Products Corporation brought this suit to recover $37,760.71 of the bank, upon the ground that the bank had obtained payment of the drafts on the

faith of its warranty that all prior endorsements were genuine, when in fact those of the payees were forged.

The Chancellor found that Eakle acted within his authority as agent of complainant in issuing the drafts with the forged endorsements thereon and that the drafts should be regarded as issued by complainant itself; and, following Litchfield Shuttle Co. v. Cumberland Valley Nat. Bank, 134 Tenn., 379, 183 S. W., 1006, and like cases, he held that complainant by issuing the drafts with the endorsements thereon warranted that they were genuine, and was precluded from asserting to the contrary; and he dismissed the bill.

Complainant appealed. It insists that Eakle acted for himself and outside his authority as its agent and it is not precluded from setting up the forged endorsements and from relying upon the bank's warranty that they were genuine; and that, upon the authority of State v. Broadway Nat. Bank, 153 Tenn., 113, 282 S. W., 194, it is entitled to recover of the bank what it paid the bank upon the forged endorsements which the bank warranted to be genuine.

This issue of authority is to be resolved upon appellant's proof. Appellee took none. The only witnesses on the point were Mr. Foster, vice-president and treasurer, and Mr. Lackey, auditor of appellant. These are the material facts to which they testified.

J. C. Eakle had been a trusted employee of appellant for 20 years. E. H. Eakle, his brother, was assistant treasurer of appellant. He was an inspector and the superintendent of the timber and cordwood departments. He had three other inspectors under him. The cordwood had to be aged for about eight months before being used. Due to lack of storage space, appellant would purchase the wood and leave it at places where it had been cut or yarded until it was ready for use. J. C. Eakle's duties were to purchase the cordwood and to keep inventories of it.

He was authorized to issue drafts on the corporation to pay for the wood. He was supplied with blank forms of drafts. On the attached vouchers were blanks to be filled up, showing in detail the purpose for which the draft was issued. He would issue drafts on the corporation, payable to the order of sellers, cutters, and haulers of wood; but he was not authorized to issue a draft without supplying the information on the voucher to show what the draft was issued for. He was not authorized to issue checks. Checks were valid only when signed by two officers of the corporation. He was not an officer or a fiscal agent of the corporation. He was not authorized to issue drafts payable to cash or bearer, or to issue drafts and get money on them to pay for wood.

In a few instances, however, he had issued checks, and in a few instances he had issued drafts payable to a "named payee and/or cash"; and these drafts and checks had been honored. Also in a few instances he had issued drafts payable to the order of a named payee and had endorsed the payee's name by himself.

In February 1937, when the first of the drafts here in suit came to the American National Bank, Mr. Lackey called Mr. Foster's attention to the fact that J. C. Eakle was endorsing the drafts and passing them through his personal account at the Broadway National Bank. He said he "knew from past experience that similar drafts had been handled by J. C. Eakle in this manner," and as auditor he "did not care to honor future drafts of this nature without his (Mr. Foster's) knowledge of it." They, however, agreed that such drafts should be honored, because the Broadway National Bank had guaranteed the endorsements and because they could see it often might be more convenient for Eakle to pay the cordwood men the cash out of his own pocket and have them endorse the drafts so that he could reimburse himself. Mr. Lackey testified:

"Q. Did Mr. Foster have anything to say about the apparent reason for J. C. Eakle's endorsements on these drafts other than what you have already stated?

"A. Yes sir, we discussed the method by which payment was made to the different cord wood men from whom the purchases were made and we could naturally see the practicability or reason for Mr. Eakle handling the drafts in this manner. That is, the cord wood men being located quite a distance in some cases away from banks and when Mr. Eakle would make trips to these outlying points, it seemed very reasonable that he would take cash money with him and pay for the cord wood purchased, having the payee at that time endorse the draft in exchange for the cash and Mr. Eakle bringing the draft back to Nashville and cashing or depositing same in his personal account; or we even considered that possibly in some instances the supposed payee would even accompany Mr. Eakle to the Church Street branch of the Broadway National Bank as Mr. Eakle was well known, simply cash the draft at that time with the payee in the office of the Broadway National Bank."

Mr. Foster said:

"Q. Now, you said that Mr. Lackey had called your attention to the fact that drafts signed by J. C. Eakle had been endorsed by J. C. Eakle and that the Broadway National Bank had endorsed these same drafts. What was your reaction to that with reference to whether there was anything irregular about it?

"A. That had been a practice for Eakle to endorse some of these drafts for several years. The explanation of it was that these people to whom he owed the money would need the money, they were that class of people who would have to have it promptly, and Eakle would pay them the cash, make out a draft and these men were supposed to endorse the draft and turn it over to Eakle, who in turn would endorse it and reimburse himself for the cash paid out personally."

So they thought Eakle was advancing his own money to the cordwood men, having them endorse the drafts, endorsing them him-

self, and cashing or depositing them in his personal account for his reimbursement; and they acquiesced in this for about nine months. They were officers of the corporation, and their acquiescence was its acquiescence. This course of conduct between the agent and principal, we think, justifies the inference that such conduct was in fact authorized and that Eakle was authorized to advance his own money and to issue and use the drafts for reimbursement and as vouchers.

■ Able counsel for appellant argue that such conduct could not enlarge the agent's actual authority; that its only effect might be to create apparent authority or agency by estoppel in favor of a third person who dealt with the agent in reliance upon such conduct; but that appellee dealt with Eakle as an individual and a customer and not as agent of appellant, and cannot rely on such conduct to create an agency by estoppel for its protection. We cannot follow this argument. Since appellee's title to the paper derived from the agent's authority, it may rely on that authority, if it in fact existed. If Eakle's authority had been precisely fixed in writing, there might be no room for construction or resort to conduct to ascertain the extent of such authority; but it rested in parol, and what he did, with knowledge and approval of the principal, is circumstantial evidence of what he was authorized to do. In 1 Mechem on Agency (2 Ed.), p. 506, it is said:

''For it is entirely clear that the continued conduct of the principal may be used to show how a grant of power was intended to be interpreted, and, further, the voluntary acquiescence of the principal in the known course of conduct of the agent may serve to show that such conduct was in fact authorized. This does not depend upon estoppel but is an inference of fact to be drawn from conduct. It is, therefore, not essential, as it is in cases resting upon estoppel, that the other party shall have known of the facts at the time and relied upon them, but he may, as in other cases of actual authority, prove the authority though he was ignorant of it at the time of the act.''

■ As stated, we think it is clear from the testimony of appellant's witnesses above quoted that Eakle was acting within his actual authority in advancing his own money to pay the cordwood men, issuing the drafts payable to their order, having them endorse the drafts, endorsing them himself, and cashing or depositing them to his personal account for his reimbursement. He was entrusted with this authority and power because it was believed he would use it honestly for his principal and not fraudulently for himself, and it may be, as these witnesses say, that the bank's guaranty of the endorsements gave them added assurance; but these were merely motives for allowing the agent to have the power, not limits upon such power. Nor does the fact that he misused the power affect the limits of it. In Bank of Bengal v. Fagan, 13 English Reports (Privy Council II), 61, 74, where an agent, with power of attorney to negotiate a negotiable instrument for his principal, negotiated it for himself, Lord Brougham said:

"But it is said, that the power was given to do the acts in question on the donor's behalf. This is really only saying, that what the agent is to do, he is to do as representing the principal; as doing it on behalf of, or in the place and in the right of, the principal. But it is further said, that even if the expression be read as only amounting to this, the endorsement is to be only made for the benefit of the principal, and not for the purposes of the agent. We do not see how this very materially affects the case, for it only refers to the use to be made of the funds obtained from the endorsement, not to the power; it relates to the purpose of the execution, not to the limits of the power itself; and though the endorsee's title must depend upon the authority of the endorser, it cannot be made to depend upon the purposes for which the endorser performs his act under the power."

In Litchfield Shuttle Co. v. Cumberland Valley Nat. Bank, supra, complainant's agent, who had been entrusted with authority to draw on its bank account, made checks payable to certain persons, forged endorsements of these payees, cashed the checks and converted the money. Complainant sought to hold the bank for what it had paid out of complainant's account on the forged endorsements. But the Court held that the act of the agent in issuing the checks with the endorsements thereon was the act of complainant itself; and that under section 65 of the Negotiable Instruments Act, Code, section 7389, complainant by issuing the checks bearing the endorsements warranted that they were genuine and by section 23, Code, section 7347, complainant was precluded from setting up the forgery of the endorsements.

The agent's authority in that case to issue checks was hardly more extensive than the agent's authority in this case to issue drafts. In both cases the extent of the authority and the circumstances were such as to indicate that the agent had advanced his own funds for his principal and was issuing the instruments for his reimbursement and as vouchers. In that case the Court said [134 Tenn., 379, 183 S. W., 1008]:

". . . Considering the character of complainant's business and the extent of Hooper's authority, the defendant bank may very well have concluded that the checks here in controversy represented expenses of the mills paid in cash by Hooper, and that the checks were drawn and indorsed by him as vouchers."

In this case complainant's officers thought Eakle was advancing his own money to the cordwood men, having them endorse the drafts, endorsing them himself, and cashing or depositing them in his personal account in the Broadway National Bank for his reimbursement; and there was nothing to indicate to the contrary to the defendant bank; and it owed complainant no duty of active inquiry in order to avoid the imputation of bad faith in purchasing the drafts. Corinth Bank

& Trust Co. v. Security Nat. Bank, 148 Tenn., 136, 148, 252 S. W., 1001.

So we think the Chancellor rightly held that this case is ruled by Litchfield Shuttle Co. v. Cumberland Valley Nat. Bank, and that appellant is precluded from asserting that the endorsements were forgeries.

There is another ground upon which appellant is precluded. Its agent made the drafts payable to the order of persons who had no interest in the drafts and were not intended by the agent to receive them. Some of these payees were fictitious and none of them had any interest in the drafts or were intended by the agent to receive them. The act and intent of the agent in making the drafts so payable was the act and intent of appellant, the drafts were payable to bearer, section 9, (3), Negotiable Instruments Act, Code, section 7333, (3), title thereto passed by delivery to the bank and appellant cannot treat the endorsements as forgeries and cannot recover of the bank. Phillips v. Mercantile Nat. Bank of New York, 140 N. Y., 556, 35 N. E., 982, 23 L. R. A., 584, 37 Am. St. Rep., 596; Snyder v. Corn Exchange Nat. Bank, 221 Pa., 599, 70 A., 876, 128 Am. St. Rep., 780; Bartlett v. First Nat. Bank, 247 Ill., 490, 93 N. E., 337; American Hominy Co. v. Nat. Bank of Decatur, 294 Ill. 223, 128 N. E., 391; Choctaw Grain Co. v. First State Bank of Jet, 175 Okl., 458, 53 P. (2d), 579; Pennsylvania Co., etc., v. Federal Reserve Bank, D. C., 30 F. Supp., 982; Bourne v. Maryland Cas. Co., 185 S. C., 1, 192 S. E., 605, 118 A. L. R., 1; also the cases collected in the Annotations, 74 A. L. R., 822, 118 A. L. R., 17, 38.

Appellant relies on State v. Broadway Nat. Bank, 153 Tenn., 113, 282 S. W., 194; Figuers v. Fly, 137 Tenn., 358, 193 S. W., 117; People's Bank v. Franklin Bank, 88 Tenn., 299, 12 S. W., 716, 6 L. R. A., 724, 17 Am. St. Rep., 884. These cases are not in point. In none of them was complainant precluded from asserting that the endorsements were forgeries. The forgeries were not committed by the drawer or by his agent with authority to issue the instruments. Nor were any of the instruments payable to a fictitious payee.

For these reasons, we think the Chancellor's decree was correct, and it is affirmed. Appellant and its surety will pay the costs of the appeal.

Crownover, P. J., and Howell, J., concur.

### On Petition for Rehearing.

FELTS, J. By petition for a rehearing the Tennessee Products Corporation complains of a statement in our opinion that "in a few instances he (J. C. Eakle) had issued checks" on the Tennessee Products Corporation. This statement is not supported by the record, and it was an inadvertence. We now accordingly correct it.

However, it was immaterial and had no bearing upon our conclusion that Eakle acted within his authority in issuing the drafts with the forged endorsements thereon, on which this suit is based.

We have already considered all the other matters presented by the petition; and it presents no new matter, cites no new authority and makes no argument not already considered and determined in our former opinion.

The petition in the one particular above indicated is granted. In all other respects it is denied. Petitioner will pay the costs incident to the petition.

Crownover, P. J., and Howell, J., concur.