**K. T. McCONNICO, Jr., Trustee, Appellee,**

**v.**

**THIRD NATIONAL BANK IN NASHVILLE, Appellant.**

Supreme Court of Tennessee.

July 16, 1973.

Seymour Samuels, Jr., Farris, Warfield & Samuels, Nashville, for appellee.

D. L. Lansden, William P. Johnston, Waller, Lansden, Dortch & Davis, Nashville, for appellant.

## OPINION

HUMPHREYS, Justice.

This is a suit by the trustee in bankruptcy of W. T. Hardison & Company against the defendant bank which cashed or received for deposit ten (10) checks drawn by W. T. Hardison & Company or payable to that Company. The complainant contends that Tom Hardison, Jr., also referred to as W. T. Hardison and W. T. Hardison, IV, misappropriated the funds of W. T. Hardison & Company by converting the checks in question or their proceeds to his own use, and that the defendant bank participated in said conversion by cashing or receiving the checks for deposit in Hardison's personal account and then permitting him to withdraw the proceeds so deposited. The transactions complained of occurred over a period of three years from February 24, 1967 to August 15, 1969.

Nine of the ten checks upon which the complainant based his claim were checks issued by W. T. Hardison & Company drawn on its account at the First American Bank and signed by W. T. Hardison as president of that Company. The other check involved was issued by Merrill Lynch, Pierce, Fenner & Smith, payable to the order of W. T. Hardison and Company.

The transactions involving the checks can be divided into four separate caegories.

(1) A check in the amount of $15,000.00 of W. T. Hardison and Company payable to Cash and deposited by Tom Hardison, Jr., in his personal checking account in the defendant bank.

(2) Two checks of W. T. Hardison and Company payable to Cash and negotiated for cash at the defendant bank by B & B Liquor Store, a transferee of Tom Hardison, Jr.

(3) A check issued by Merrill Lynch, Pierce, Fenner & Smith to W. T. Hardison & Company endorsed for the company by W. T. Hardison and deposited in his personal checking account at the defendant bank.

(4) Checks issued by W. T. Hardison and Company payable to the order of Clear Creek Coal Company, signed by W. T. Hardison and endorsed by him in the name of Clear Creek Coal Company, not delivered to Clear Creek Coal Company but deposited by Hardison in his personal checking account in the defendant bank.

The cause came to be heard before the Chancellor on the pleading, depositions and oral testimony of witnesses, stipulations of the parties, documentary evidence, briefs, and arguments of counsel resulting in a judgment for the plaintiff in the full amount of the ten checks and interest totaling $116,333.73. The Court of Appeals sustained the Chancellor as to the checks payable to the Clear Creek Coal Company, but reversed and remanded as to the two checks cashed for B & B Liquor Store, the $15,000.00 check payable to Cash and deposited by Hardison in his personal account with the defendant bank, and the check of Merrill Lynch, Pierce, Fenner and Smith payable to W. T. Hardison and Company, endorsed by Hardison and deposited by him in his personal account with the defendant.

Since this case involves the application of various sections of the Uniform Commercial Code, enacted in this State in 1963, which have not been fully considered by this Court and, therefore in need of judicial clarification, this Court granted the writs of certiorari sought by both parties.

The facts in this case are not in dispute; however, the parties do not agree on the inferences and conclusions to be drawn from those facts and the conduct of the parties. In view of the stipulations however, it will be unnecessary to enter into a lengthy discussion of testimony, there being no material determinative facts seriously in dispute, and those stipulations ac-

curately representing the controversy. Those stipulations are as follows:

(1) That the complainant is the duly appointed Trustee in Bankruptcy for W. T. Hardison & Company, a Tennessee corporation with principal office in Nashville, which filed its petition in bankruptcy on the 27th day of October, 1969; that creditors' claims totaling $1,221,401.25 have been filed against the bankrupt in the bankruptcy proceeding, of which the claim of First American National Bank is in the approximate amount of $870,891.87, and assets in the possession of the Trustee total $177,619.97. The Trustee has excepted to the claim of First American National Bank.

(2) The status of the Third National Bank in Nashville is as a national bank.

(3) That William Thomas Hardison, IV, is sometimes referred to as W. T. Hardison, IV, W. T. Hardison, Jr., Tom Hardison, Jr., and that during the years 1967, 1968 and 1969, he maintained a personal checking account with the defendant in the name of Tom Hardison, Jr., being Account No. 39-07-906-6.

(4) That during the time in question W. T. Hardison & Company did not maintain a bank account with the defendant, but

(5) That during the time in question the First American National Bank was the depository of funds of W. T. Hardison & Company.

(6) That during the time in question Tom Hardison, Jr. was the sole stockholder of W. T. Hardison & Company, and its chief executive officer.

(7) That the resolution attached as Exhibit 1 was on file with the First American National Bank of Nashville during the years 1967, 1968 and 1969. That resolution specifically authorized W. T. Hardison, IV, the President:

"To withdraw funds from any account of this corporation in said bank by checks, drafts, or orders payable to any individual, firm or corporation, including one or more of the parties signing or countersigning such checks, drafts or orders, with authority to cash or receive for deposit such instrument, payable to one or more of the signers, and said bank shall be fully protected in paying such, including overdrafts, against any of such accounts; . . . ."

(8) That the checks, Exhibit 2 to the stipulation, were drawn on the account of W. T. Hardison & Co. at First American National Bank of Nashville and executed by W. T. Hardison as President of W. T. Hardison & Co., payable to Clear Creek Coal Company of Monterey, Tennessee, and such checks were not delivered to said Coal Company but were endorsed by Tom Hardison, Jr., with the words "Clear Creek Coal Co." and deposited to the account of Tom Hardison, Jr. in the Third National Bank, and

(9) That each of these checks, payable to Clear Creek Coal Company, had written thereon, "For Deposit Only 39-07-906-6" and was paid by the First American National Bank to the Third National Bank and all proceeds were withdrawn from Third National Bank by Tom Hardison, Jr.

(10) That the check dated May 22, 1968, in the amount of $15,000.00 drawn on the account of W. T. Hardison at the First American National Bank, signed by W. T. Hardison, payable to Cash and endorsed, "W. T. Hardison & Co. by W. T. Hardison," was deposited in the account of Tom Hardison, Jr., at the Third National Bank in Nashville from which the proceeds were withdrawn by Tom Hardison, Jr. The said check was charged to W. T. Hardison on the books of W. T. Hardison & Co.

(11) That check dated February 24, 1967, payable to Cash, in the amount of $2,750.00, drawn on the account of W. T. Hardison & Co. at the First American National Bank by W. T. Hardison, bears the endorsement of W. T. Hardison and B & B Liquor Store, and this check was negotiated for cash by transfer from B & B Li-

quor Store to Third National Bank which paid cash to B & B Liquor Store in the face amount of the check. The said check was charged to W. T. Hardison on the books of W. T. Hardison & Co.

(12) That check dated March 24, 1967, payable to Cash in the amount of $3,500.00 drawn on the account of W. T. Hardison & Co. at the First American National Bank by W. T. Hardison, bears no endorsement other than a typewritten endorsement, "B & B Liquor Store," and that said check was negotiated for cash by transfer from B & B Liquor Store in the face amount of the check. The said check was charged to W. T. Hardison on the books of W. T. Hardison & Co.

(13) That the First American National Bank of Nashville was the bank upon which each check payable to Clear Creek Coal Company was drawn and upon which the two checks bearing the endorsement of B & B Liquor Store and the checks referred to in paragraph 10 hereof were drawn, and the defendant, Third National Bank, endorsed each of the aforesaid checks, prior endorsements guaranteed, transmitted them through the clearing house to the drawee bank for payment and received payment therefor.

(4) On June 4, 1968, W. T. Hardison & Company issued its check No. 5053 drawn on the First American National Bank, payable to the order of Merrill Lynch, Pierce, Fenner & Smith for $10,135.15, which was charged on the books of W. T. Hardison & Company to W. T. Hardison, IV (Tom Hardison, Jr.), personally, and was delivered by Tom Hardison, Jr. to Merrill Lynch, Pierce, Fenner & Smith for Tom Hardison, Jr.'s personal debt; this check was deposited by Merrill Lynch, Pierce, Fenner & Smith in its bank account and was paid by the drawee bank. On June 25, 1968, Merrill Lynch, Pierce, Fenner & Smith issued its check No. 18485 payable to the order of W. T. Hardison & Company in the amount of $10,135.15, drawn on Third National Bank in Nashville, payable to W. T. Hardison & Company as a refund of the $10,135.15 check it had received from W. T. Hardison & Company on June 4, 1968, and the said check No. 18485 of Merrill Lynch, Pierce, Fenner & Smith, payable to the order of W. T. Hardison & Company, was endorsed by W. T. Hardison & Company by W. T. Hardison, and had written thereon, "For Deposit to 39–07–906–6," and was deposited in the Third National Bank in his personal account which was credited with the amount of the check of June 26, 1968. On June 26, 1968, his said personal account in the Third National Bank was charged with a check payable to the order of Merrill Lynch, Pierce, Fenner & Smith in the amount of $12,263.30, representing a check he had delivered to Merrill Lynch, Pierce, Fenner & Smith, drawn on his personal account at the Third National Bank for an obligation of Tom Hardison, Jr.

(15) On August 21, 1969, Tom Hardison, Jr., issued a check on his personal account at Third National Bank, payable to the order of said Bank, for $10,000.00, with which he purchased from the Third National Bank's Melrose Office, 531 Franklin Road, Nashville, Tennessee, One Hundred (100) American Express Travelers Cheques for $100 each.

It is important to note at this point that there is no claim of fraud or dishonesty on the part of the defendant bank in the transactions herein involved. The trustee merely contends that the defendant bank is liable on said checks because it cashed or received them for deposit to Hardison's personal account and permitted him to withdraw the proceeds for his personal use contrary to accepted banking practices. Further, its liability stems from its negligent failure to investigate the transactions in question which were out of the ordinary and conducted in such a manner so as to put the defendant bank on notice of such irregularities.

The defendant bank asserts the following defenses in denying liability:

(1) At the time of each transaction the defendant had no knowledge of any fraud, misappropriation of funds or other wrongdoing by Hardison;

(2) Those checks which defendant cashed or accepted as deposits were received in good faith, in reliance on the validity of the maker's signature and the legal effectiveness of the endorsements, and insists that it was the holder in due course in good faith and for value;

(3) That as to the defendant, the endorsements by Hardison of the payee's name on the checks payable to Clear Creek Coal Company were effective endorsements, since those checks were signed by Hardison on behalf of W. T. Hardison & Company, intending that the payee have no interest in such checks;

(4) That the defendant received the check of Merrill Lynch, Pierce, Fenner & Smith, which was payable to the order of W. T. Hardison & Company and endorsed by Tom Hardison for his Company (with authority to do so) and for deposit to his personal account with the defendant as a holder in due course, without any knowledge of fraud, misappropriation or bad faith;

(5) That the acts of Tom Hardison, Jr. in connection with said checks, were the acts of W. T. Hardison & Company since he acted within the scope of his authority in signing, endorsing and transferring said checks;

(6) That all of the said checks drawn on the W. T. Hardison & Company account at the First American National Bank were paid by the drawee bank to which defendant guaranteed prior endorsements and such payment is final in favor of defendant as a holder in due course;

(7) That Tom Hardison, Jr., the sole stockholder of W. T. Hardison & Company, its President, chief executive and financial officer, so controlled and dominated the corporation that it merged into his individuality and became a mere instrument of his will so that his acts were the acts of the corporation and were authorized by the said corporation with the consent of its shareholders.

In view of the complicated nature of the transactions involved, each category of checks as previously designated will be discussed separately.

The first transaction involved a check for $15,000.00 which was drawn on the account of W. T. Hardison & Company at the First American National Bank, payable to cash and deposited by Tom Hardison, Jr., in his personal account at the defendant bank. Hardison subsequently paid approximately $11,000.00 on a personal loan to the defendant bank by two checks drawn on his personal account into which the company check had been deposited. The complainant insists that the effect of this transaction was the discharge of Hardison's personal debt to the defendant with a corporate check, and the bank was charged with this knowledge at the time of the deposit and subsequent payment. The defendant bank insists that it was a holder in due course of the check.

A holder in due course is a holder who takes the instrument for value, in good faith, and without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person. T.C.A. § 47–3–302(1). To the extent that a holder is a holder in due course, he takes the instrument free from all claims to it on the part of any person and all defenses of any party to the instrument with whom the holder has not dealt except the enumerated "real defenses." *See*, T.C.A. § 47–3–305.

That concept is important in the instant case because of the adverse claim asserted by the complainant. It has been held that a transferee who knows that a fiduciary payee is misapplying the proceeds of a check may be held liable to the extent of

the loss to the person for whose benefit the proceeds should have been applied. Maley v. East Side Bank, 361 F.2d 393 (7th Cir. 1966). If the defendant bank in the instant case took the instrument as a holder in due course, it took the instrument free from the now asserted claim of the trustee in bankruptcy to the proceeds on behalf of the creditor and shareholders.

■ Analyzing the elements required for holder in due course status, one finds that the defendant bank was indeed a holder in due course of the instrument. Those elements are as follows:

1. Value — The U.C.C. § 3–303(1) and T.C.A. § 47–3–303(1) provide that a holder takes an instrument for value to the extent that he acquires a security interest in or lien on the instrument other than by legal process. The security interests of collecting banks is set forth in T.C.A. § 47–4–208, 209. Had the claim of the trustee been asserted prior to final settlement of the instrument by the First American National Bank, the defendant bank would have had to establish value in accordance with T.C.A. § 47–4–208(1)(a). It is apparent that the defendant bank could have done so as it was stipulated that Hardison withdrew the funds in question. Also, in the instant case, there was a final settlement of the item when it was paid by the First American National Bank. When a bank receives a final settlement for an item as described by T.C.A. §§ 47–4–211(3), 4–213(2), the credit which it gave to its customer for the item becomes final. T.C.A. § 47–4–213(3). A debtor-creditor relationship replaces the agency relationship, and the bank is accountable to the customer for the amount of the item. T.C.A. § 47–4–213(3). Under these facts, there can be no doubt that the defendant bank gave value within the definition of a holder in due course.

■ 2. Good Faith — The complainant argues that the defendant bank failed to exercise ordinary care in this transaction by allowing the unlawful diversion of corporate funds into Hardison's personal account. It is clear that the U.C.C. defines "good faith" as "honesty in fact in the conduct or transaction concerned." See T.C.A. §§ 47–3–302(1)(b), 47–1–201(19). A holder need not exercise due care including the observance of reasonable commercial standard in addition to "honesty in fact" to be in good faith. The legislative history of § 3–302(1)(b) indicates that the language "including observance of the reasonable commercial standards of any business in which the holder may be engaged" was deleted in the 1956 Recommendations and text. The comments to that section make it clear "that the doctrine of an objective standard of good faith. . . . is not intended to be incorporated in Article 3." Am.Law.Inst. Uniform Commercial Code, 1956 Recommendations, p. 102. This means that unless the conduct amounts to dishonesty and bad faith, in fact, due course holder status is not lost, insofar as this test is involved. In the instant case, there is no showing of such conduct as would evidence dishonesty and consequently such bad faith under the statute as to sacrifice holder in due course status.

3. Notice of any claim. — While negligence has no reflection on the "good faith" requirement of a holder's status as a holder in due course, except as to such outrageous conduct as may provide relevant evidence to the issue of honesty, it does go to the notice requirement of § 47–3–302(1) as defined by § 47–3–304 and § 47–1–201(25). Here the complainant contends that the defendant bank took the check knowing that a fiduciary was negotiating it for his personal benefit in violation of T.C.A. § 47–3–305(2) and the Uniform Fiduciaries Act, T.C.A. § 35–206. The complainant further contends that the defendant bank had notice because the funds deposited in Hardison's personal account were used, the same day, to pay a personal debt to the defendant. Those contentions are not well founded for a number of reasons.

First, T.C.A. § 47–3–304(2) states:

"The purchaser has notice of a claim against the instrument when he has knowledge that a fiduciary has negotiated the instrument in payment of or as security for his own debt or in any transaction for his own benefit or otherwise in breach of duty."

Both the Uniform Fiduciaries Act and the Uniform Commercial Code provide that knowledge that a person negotiating the instrument is or was a fiduciary does not in and of itself give the purchaser notice of a claim or defense. *See,* T.C.A. §§ 47–3–304(4)(e), 35–206, 35–210. T.C.A. § 35–210 requires that a bank which receives a deposit or pays a check have *actual* knowledge that the fiduciary is committing a breach of his obligation as fiduciary or with knowledge of such facts as to amount to bad faith. The doctrine of constructive notice was abolished by the negotiable instruments act. Our pre-Code cases clearly establish that point. Hamilton National Bank v. Swafford, 213 Tenn. 545, 376 S. W.2d 470 (1963); Hight v. McCulloch, 150 Tenn. 117, 263 S.W. 794 (1923).

Actual knowledge was defined in our pre-Code case of Corinth Bank & Trust Co. v. Security National Bank, 148 Tenn. 136, 252 S.W. 1001, (1923) as follows:

"The holder's rights cannot be defeated without proof of actual notice of the defect in title or bad faith on his part, evidenced by circumstances. Though he may have been negligent in taking the paper, and omitted precautions which a prudent man would have taken, nevertheless, unless he has acted in *mala fide,* his title according to settled doctrine, will prevail." (emphasis added).

■ In normal banking practices, checks deposited at a bank drawn on another bank are delivered to the drawee bank when paid and entries on the depositor's account do not reveal the source of the deposit. In the instant case, Hardison deposited the corporate check at a teller's window and then proceeded to the Loan & Discount Department to pay on his personal loan with a personal check. These were two separate transactions accomplished at different times, in different places, and with different parties inside the bank. These were normal banking transactions which imparted no knowledge of a breach of duty. Actual knowledge was not received until this lawsuit was filed. Without actual knowledge, either at the time of the deposit or at the time of payment of the personal debt, that corporate funds were being used to discharge the debt, the defendant bank neither had notice as required by T.C.A. § 47–3–304(2) nor was its conduct so outrageous that it points to dishonesty or bad faith so as to defeat the defendant bank's status as a holder in due course.

While the above reasoning is dispositive of the issue of notice, an even more elementary solution appears on the face of the corporate resolution on file with the First American National Bank.

It is apparent that Hardison's negotiation of the check to the defendant bank was an authorized corporate act of W. T. Hardison & Company. Tom Hardison, Jr. was the sole stockholder and president of the company. He controlled, dominated and managed its affairs. The corporation resolution, on file with the First American National Bank, gave Hardison the broad general authority to sign checks payable to "any individual, firm or corporation, including one or more of the parties signing . . . such checks . . . . with full authority to cash or receive for deposit such instrument payable to one or more of the signers. . . ."

This Court has dealt with such corporation resolution problems on two previous occasions. *See* Litchfield Shuttle Company v. Cumberland Valley National Bank, 134 Tenn. 379, 183 S.W. 1006 (1915); Knoxville Water Co. v. East Tennessee National Bank, 123 Tenn. 364, 131 S.W. 447 (1910).

In *Litchfield,* the general manager of a company had broad general powers including the authority to draw checks on the company account in the company name. The general manager drew checks payable to company suppliers, forged their signatures, and deposited them in his personal account. In *Knoxville Water Company*, an agent with very limited authority fraudulently endorsed checks payable to his principal and deposited them in his private account. In the former case, this Court held the defendant bank not liable because of the broad general powers of the general manager from which the bank could have concluded that the manager was authorized to do such. In the latter, the defendant bank was held liable because the agent had very limited authority, and the facts were such as to put the bank on notice. In the instant case, Hardison's authority was similar to that of the manager's in *Litchfield;* not limited as in *Knoxville Water Company.*

■ The complainant in the instant case attempts to dismiss the importance of that corporate resolution because it was on file with the First American Bank and the defendant bank did not know of its existence until this suit. It is clear, however, that where an agent has the actual authority to perform an act, the one dealing with him need not know of that authority at the time of the transaction to bind the principal if that authority actually existed. Tennessee Products Co. v. Broadway National Bank, 25 Tenn.App. 405, 158 S.W.2d 361; Bagley v. Union Buffalo Mills Co., 9 Tenn.App. 63 (1928). Further, had the facts been such so as to put the defendant bank on notice, a reasonable inquiry on their part would have revealed that such use of corporate property by Hardison was authorized by the corporate resolution. The defendant bank could not be expected to go further and survey the capital, assets and liabilities of W. T. Hardison and Company to determine if the company was solvent or its capital was being impaired.

It results, therefore, that under no theory could the defendant bank be held liable on this first transaction.

The second category involves two checks signed by Hardison on W. T. Hardison & Company, payable to cash, negotiated by Hardison to B & B Liquor Store which in turn negotiated the checks to the defendant bank for cash. The record reveals that B & B Liquor Store was a regular customer of the defendant bank, that the owner frequently cashed checks for his customers and in turn deposited them, and that these checks were charged on the books of W. T. Hardison & Company against Tom Hardison, Jr. The checks were received by the bank from B & B Liquor store in the usual course of business and paid by the First American Bank when presented by the defendant bank. There is no claim that the defendant bank received any benefit from these checks.

■ Under the Uniform Commercial Code, these transactions are clearly ones where the bank received checks for value, in good faith, and without notice of any claims or defenses. Therefore, the defendant bank qualifies as a holder in due course. The bank received these checks under routine circumstances as bearer instruments from a known customer and paid value in the face amount. Value and good faith clearly not being in question, only notice is deserving of discussion.

■ As stated previously, knowledge that a person is or was a fiduciary does not in itself give the purchaser notice of a claim or defense. T.C.A. § 35–206; 47–3–304(4)(e). Therefore, that there was a breach of duty, which has been discussed previously, the defendant bank's status as a subsequent holder in due course and rights thereunder are not subject to recission, a constructive trust, or any other legal remedy. T.C.A. § 47–3–207(2).

The third category was a single check for $10,135.15 issued by Merrill Lynch,

Pierce, Fenner and Smith, payable to W. T. Hardison & Company endorsed by Hardison and deposited in his personal checking account at the defendant bank. In essence, the transaction involved three checks. Hardison first drew a company check, charged to himself on the company books, payable to Merrill Lynch, for a personal obligation. That check was deposited by the payee to its account and paid by the First American Bank. Subsequently, Merrill Lynch refunded that amount in the form of a check payable to W. T. Hardison and Company in exchange for a personal check of Tom Hardison, Jr. in the amount of $12,236.30 representing the original personal obligation and an additional obligation of Hardison slightly in excess of $2,000.00. The refund check issued by Merrill Lynch payable to W. T. Hardison & Company was endorsed by Hardison "For Deposit to 39–07–906–6," his personal account. Complainant seeks to recover that $10,135.15.

■ Again, we can find no evidence that the bank acted dishonestly or with notice of a claim as defined in § 47–3–304(2) T.C.A. The bank received the deposit in the regular course of business without any actual knowledge of a misappropriation by Hardison, if indeed there was a misappropriation. Without actual knowledge so as to show notice of a claim or defense and without "dishonesty" in the handling of the check as would evidence bad faith, or notice, the defendant bank was a due course holder of this check, and not liable to the Trustee in Bankruptcy.

The last category involves six checks in the aggregate amount of $68,048.45 drawn on the account of W. T. Hardison & Company signed by W. T. Hardison, Jr., payable to the Clear Creek Coal Company, endorsed by Hardison in the name of the Clear Creek Coal Company, and deposited to his personal account in the defendant bank.

As to these checks, the defendant bank asserts two primary defenses. First, the defendant contends that since Hardison was authorized to withdraw corporate funds payable to himself, he had no fraudulent intent in endorsing these checks in the name of the payee as he was merely accomplishing, in an unusual manner, that which he was authorized to do. Second, the defendant contends that the endorsements were sufficient to pass title to the defendant as a holder in due course because Hardison, the drawer, intended the payee to have no interest in the check. See, T.C.A. § 47–3–405(1)(b). The Court of Appeals held that the endorsements were outright forgeries not effective to pass title to the defendant, that there was nothing in the record that evidenced an intent by the agents who prepared the checks that the said Coal Company should not have an interest in them, that the defendant bank was negligent in cashing said checks, that the Coal Company was damaged and sustained a loss by the transactions, that a bank receiving and collecting a check upon a forged or unauthorized endorsement is liable to the payee for the proceeds, that where the payee is a bona fide creditor of the drawer, the bank is not relieved of liability to the drawer on the theory that it was not intended that payee have an interest in the instrument, and that the Trustee, standing in the shoes of a bankrupt corporation, can recover on behalf of the corporation and its creditors.

We agree with the Court of Appeals that these endorsements were outright forgeries. T.C.A. § 39–1701 provides that "[F]orgery is the fraudulent making or alteration of any writing to the prejudice of another's rights." The president of the Coal Company testified that W. T. Hardison & Company had been a customer of his company for some five years prior to the time the Hardison Company went into bankruptcy and that the current balance due was "about $33,000.00 or $34,000.00". Further, the records of the bankrupt reflect that the checks in question were credited against the indebtedness of the bankrupt to the Coal Company. Under these

facts, it is clear that the Clear Creek Coal Company was damaged and did sustain a loss by the unauthorized cashing of these checks. This is particularly true in view of the fact that the indebtedness was credited on the Hardison Company books. As such, the unauthorized endorsements fall within our statutory definition of forgery.

■ However, that is not to say that the unauthorized endorsements could not have been effective to pass title as inferred by the Court of Appeals. T.C.A. § 47–3–405(1)(b) specifically provides that "an endorsement by any person in the name of a named payee is effective if a person signing as or on behalf of a maker or drawer intends the payee to have no interest in the instrument." Paragraph 3c of the Official Code Comment to that section states as an example:

> "3. Subsection (1)(b) restates the substance of the original Subsection 9(3). The test stated is not whether the named payee is 'fictitious,' but whether the signer intends that he shall have no interest in the instrument. The following situations illustrate the application of the subsection. . .

> c. The drawer makes the check payable to P, an existing person whom he knows, intending to receive the money himself and that P shall have no interest in the check."

Further, it is clear that the statute is to be applied to unauthorized or forged signatures as subsection (2) provides: "Nothing in this section shall affect the criminal or civil liability of the person so endorsing."

The situation then is precisely the situation mentioned in paragraph 3c of the Official Code Comments to T.C.A. § 47–3–405. The only element which could possibly be in doubt is the intent of the drawer. While intent cannot be presumed, the circumstantial evidence establishes the necessary intent. Hardison signed and endorsed in the name of the payee six checks which he deposited to his personal account. This was a consistent pattern of conduct over fourteen months. Absent some showing to the contrary, the only inference to be drawn is that he intended to use the proceeds himself and intended the payee to have no interest therein. It follows then that the endorsement was effective to pass title to the defendant.

Having established that title passed to the defendant bank, its status as a holder in due course then comes into question. Value and good faith again not being in question, only notice of claim or defense will be discussed. See T.C.A. § 47–3–302. As stated previously in the discussion of notice, negligence goes to the notice requirement of T.C.A. § 47–3–302(1) as defined by 47–3–304 and 47–1–201(25). T.C.A. § 47–3–304(1)(a) provides as follows:

> "1. The purchaser has notice of a claim or defense if

> (a) the instrument is so incomplete, bears such visible evidence of forgery or alteration, *or is otherwise so irregular as to call into question its validity*, terms or ownership or to create an ambiguity as to the party to pay; or . . . . " (Emphasis added)

In the instant case, there were six checks of W. T. Hardison & Company signed by the president, W. T. Hardison, payable to the Clear Creek Coal Company with the purported endorsement of that company and the following restrictive endorsement: "For Deposit Only 39–07–906–6." From the face of the instrument, it could be determined that the Clear Creek Coal Company, designated payee, was depositing checks in the personal account of the president of the drawer corporation who had himself signed the checks as drawer. Such transactions are highly irregular and call into question their validity. Additional factual circumstances bearing on the question of notice in the instant case are the deposition of Mr. Warren Gray, one of the defendant bank's executive officers who stated the transactions were unusual and should have caused fur-

ther inquiry, the fact that the defendant bank failed to communicate at any time with the Coal Company regarding these unusual transactions, and the Teller's Manual of the defendant bank which provides: "Checks payable to corporations cannot be cashed. These must be deposited." Presumably this means that such checks must be deposited in the account of the payee, not the personal account of the drawer.

█ While facially these latter transactions may appear the same as the previous ones, particularly the check from Merrill Lynch to W. T. Hardison & Company, endorsed by Hardison and deposited to his personal account, that is simply not the case. In that instance and the others heretofore cited, the defendant simply did not have actual knowledge or notice from the face of the instrument that a fiduciary was negotiating the instruments for his own benefit and in violation of his duty. As previously pointed out, had the defendant bank checked further, they would have discovered that Hardison was authorized to do what he did. In the case of the checks payable to the Coal Company, however, the defendant bank received notice from the face of the instruments that the transactions were highly irregular thereby calling into question their validity. Had the bank then checked further, they certainly would have discovered that Hardison was not authorized to endorse checks in the name of the Clear Creek Company. It results, therefore, that the defendant bank had notice of an irregularity on the face of instruments payable to the Clear Creek Coal Company, that such notice precludes them from holder in due course status, that their breach of duty resulted in serious detriment to the corporation's creditors, and that they are liable to the Trustee in Bankruptcy on these instruments.

In conclusion, the defendant bank asserts two additional defenses which this Court finds are without merit but deserve discussion. First, the defendant bank states that the Trustee in Bankruptcy stands in the shoes of the bankrupt corporation, and any defense which is available against the corporation is available against the trustee. 4 Collier, Bankruptcy (14th Ed.) § 67.32, p. 502; 4A Collier, Bankruptcy (14th Ed.) § 70.04, p. 55. The defendant bank reasons that while a corporate officer or his transferees may be liable to the corporation or trustee in bankruptcy for conversion of corporate assets, that rule of liability does not apply when the acts of the officer have been ratified by all of the shareholders of the corporation. Ratification by the shareholders of an unauthorized act of an officer makes that act an authorized act of the corporation, and the corporation then loses any right of action against the officer. The corporation having no right of action, it follows that the trustee in bankruptcy has no such right. Field v. Lew, 184 F. Supp. 23 (E.D.N.Y.1960). In the instant case, Hardison, as sole stockholder of W. T. Hardison and Company, ratified his own actions; therefore neither the corporation nor the trustee has a right of action against either Hardison, as president of the corporation or the defendant bank as a transferee.

█ Dispositive of this issue, however, is the elementary principle that a corporation cannot ratify a criminal act. A corporation may ratify only unauthorized acts of its officer which are within the scope of the corporate powers and which might have previously been authorized. However, it cannot ratify an act which it does not have the power to legally do. 19 C.J.S., Corporations, § 1014, pp. 486–487. It is clear that it is not within the corporate power to forge an endorsement to the prejudice of another's rights, and, therefore, those unauthorized acts cannot be the subject of ratification.

Last, since the defendant bank cannot be relieved of liability on either the ratification or holder in due course theories, it asserts that there can be no recovery by the trustee as there is no evidence that the transactions involved rendered the corpora-

tion insolvent or occurred when the corporation was insolvent. The Federal Bankruptcy Act, § 67d, 11 U.S.C.A. § 107(d) provides in pertinent part:

(2) Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent; or (b) as to then existing creditors and as to other persons who become creditors during the continuance of a business or transaction, if made or incurred without fair consideration by a debtor who is engaged or is about to engage in such business or transaction, for which the property remaining in his hands is an unreasonably small capital, without regard to his actual intent; or. (c) as to then existing and future creditors, if made or incurred without fair consideration by a debtor who intends to incur or believes that he will incur debts beyond his ability to pay as they mature; or (d) as to then existing and future creditors, if made or incurred *with actual intent* as distinguished from intent presumed in law, *to hinder, delay, or defraud* either existing or future creditors. (Emphasis added).

It is our opinion that the facts in the instant case are within the provisions of § 67d(2)(d). That clause is the only provision of subdivision § 67d(2) which requires actual fraudulent intent. But further, if a conveyance is made with that actual intent to hinder, delay or defraud existing of future creditors, the trustee is under no duty "to show that the transaction was consummated during the bankrupt's insolvency or precipitated this insolvency." 4 Collier, Bankruptcy § 67.37, pp. 531–532.

The problem inherent in invoking § 67d(2)(d) is, of course, proof of that actual fraudulent intent. Collier provides us with a workable solution as to the establishment of that actual intent.

Even under § 67d(2)(d) the finding of the requisite intent may be predicated upon the concurrence of facts which, while not direct evidence of actual intent, lead to the irresistible conclusion that the transferor's conduct was motivated by such intent. Rarely will a fraudulent transferror disclose his fraudulent intent in a mode capable of direct proof. Unless the clause is to have a severely restricted scope, it would seem to cover cases where the trustee shows that the transferror acted under circumstances which forbid any reasonable conclusion other than that the transfer was fraudulent as to his creditors.

Circumstances from which courts have been willing to infer fraud include concealment of facts and false pretenses by the transferor, reservation by him of rights in the transferred property, his absconding with or secreting the proceeds of the transfer immediately after their receipt . . .

Since clause (d) under discussion requires an actual intent to hinder, delay, or defraud, its application cannot be mechanical. As Judge Hough so aptly said:

The elements productive of that intent . . . can never be defined. They vary as do facts, and any judge or jury, dealing with facts by some rule of thumb, will always miss the human touch. Testimony can never be tested or weighed by machine.

But, courts, guided by common commercial knowledge and practices, awake to the ingenuity of fraud, yet faithful to the requisite of actual intent, can forge clause (d) into an effective instrument against fraud in fact. 4 Collier, Bankruptcy (14th Ed.) § 67.37, pp. 536–44.

The facts in the instant case lead to the irresistible conclusion that Hardison's bizarre conduct was motivated by the intent to utilize corporate assets for his personal benefit and thereby defraud the corporation's creditors. In fact, there can be no other realistic conclusion.

Having thus established that there was a fraudulent transfer, the question of the trustee's authority arises in that it was previously stated herein that Clear Creek Coal Company's rights were prejudiced by the forging of the six checks in question. Further, the evidence shows that while Clear Creek Coal Company's account was credited on the bankrupt corporation's books with the amount of those six checks, the corporation at the date of adjudication of bankruptcy owed the coal company $33,000.00 or $34,000.00. Those facts, of course, suggest a continuing business relationship and some subsequent payments from the corporation to the coal company. It is unfortunate that the records of the corporation are not a part of this record, but we proceed, nonetheless, on the basis of the stipulated facts. Accordingly, the following questions arise: Can the trustee maintain this suit or is the cause of action personal to Clear Creek Coal Company as its rights were prejudiced? If the trustee can maintain the action, can he recover the full amount represented by the checks or only the amount owed to the coal company. And, is the recovery for the benefit of that creditor with the cause of action alone or of the entire estate for the benefit of all creditors?

■ The answer to these questions again comes from the Bankruptcy Act itself. Section 67d declares that transfers fraudulent as to creditors with provable claims are null and void against the trustee. Further, title to the property transferred fraudulently as to creditors is vested in the trustee by virtue of § 70a(4), and "§ 47a(1) is interpreted as imposing a duty on the trustee to institute proceedings to set aside fraudulent transfers." 4 Collier, Bankruptcy (14th Ed.), § 67.49, p. 690. It

is thus clear that it is not only the right but also the duty of the trustee to institute and maintain the present action. *See*, 4 Collier, Bankruptcy (14th Ed.) § 67.48(2), p. 679 as to the rights of creditors to sue in their own capacity under § 67.

■ The second question involves the measure of recovery by the trustee. Is he limited to that which the defrauded creditor could recover? The doctrine of Moore v. Bay, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931), clearly calls for quantum recovery. While a trustee cannot set aside a transfer unless he can show that the transfer was fraudulent under § 67d as against a creditor having a provable claim under the Act, he is not confined to the rights which that creditor would have had if bankruptcy had not ensued. "Where the trustee can show that the transfer qualifies as one that is fraudulent under § 67d against a creditor having a provable claim under the Act, the court is under a duty to set aside the transfer or obligation *in toto* without reference to the amount of the claim of the defrauded creditor." 4 Collier, Bankruptcy (14th Ed.) § 67.49, p. 698.

As to distribution, it is settled that property recovered by the trustee is held for the benefit of all creditors. Heffron v. Duggins, 115 F.2d 519 (9th Cir. 1940). In his discussion of § 70e of the Bankruptcy Act, Collier points to the three problems alluded to herein. He states that the answers to these questions "are not necessarily germane only to § 70e. They may be fully applied also under §§ 67d and 70c." 4 Collier, Bankruptcy (14th Ed.) § 70.-95(1), p. 1103. In reference to distribution, it is stated therein:

It is settled that in cases where the trustee has the power to avoid a transfer or obligation by reason of the right of one particular creditor, it can be avoided by the trustee acting for that creditor with resulting benefit to all, regardless of the status of other creditors respecting voidability. The action of the trustee is for the benefit of the estate, even

though all creditors benefit by the avoidance which some of them could not have secured in their own behalf. 4 Collier, Bankruptcy (14th Ed.) § 70.95(2), p. 1105.

It results, therefore, having considered the assignments of error of both parties, that the judgment of the Court of Appeals disallowing recovery for the first three categories of checks and allowing recovery for the fourth category involving the forged endorsement of the Clear Creek Coal Company is affirmed, that the trustee has the right to maintain the action, that he may recover the entire amount involved in the fraudulent transactions involving the forged endorsement of the coal company, and that recovery is for the benefit of all creditors having claims provable under the act. The cause is remanded for such other and further orders and decrees as may be necessary or proper in conformity with this opinion.

DYER, C. J., CHATTIN and McCANLESS, JJ., and WILSON, Special Justice, concur.

## OPINION ON PETITION TO REHEAR

The appellant Third National Bank in Nashville has filed a petition to rehear seeking to have this Court modify its judgment so as to deny recovery on one check, issued to Clear Creek Coal Company, endorsed in the name of that company by W. T. Hardison, and deposited to his personal account, upon the theory that the transfer did not occur within one year of the filing of the petition in bankruptcy. The check in question was received by the defendant bank on June 27, 1968, in the amount of $12,263.30. The petition in bankruptcy was filed on October 27, 1969.

Petitioner agreed with this Court's opinion that § 67d(2)(d) of the Federal Bankruptcy Act disposed of the petitioner's contention that the Trustee in Bankruptcy had no standing to sue without proof of insolvency of W. T. Hardison and Company

at the time the checks were negotiated. Petitioner now earnestly contends, however, that the one check in question was deposited with the defendant bank more than one year prior to the date of bankruptcy of W. T. Hardison and Company, and, therefore, it is not fraudulent with the provisions of 67d(2)(d) of the Federal Bankruptcy Act, that section providing as follows:

"(2) Every transfer made and every obligation incurred by a debtor *within one year prior to the filing of a petition initiating a proceeding under this title* by or against him is fraudulent. . . . (d) as to then existing and future creditors, if made or incurred with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors." (emphasis added).

Standing alone, petitioner's contention appears to be valid. But, it is not.

First, the issue of the solvency or insolvency of W. T. Hardison and Company was never raised by the petitioner until the case reached this Court. It was first mentioned by the Court of Appeals, particularly in the dissenting opinion which concluded that the trustee could not recover because the Federal Bankruptcy Act required an affirmative showing that the fraudulent transfers either precipitated or occurred while the corporation was insolvent. We thought that point important as it appeared to be an affirmative duty of the trustee, and, because of the complicated nature in which Hardison conducted his business and lack of corporate records before this Court, it was impossible to say whether these transactions precipitated insolvency or not. As our original opinion indicates, however, a conveyance made with actual intent to hinder, delay, or defraud creditors, as was the only realistic conclusion in this case, may be set aside without regard to that showing of insolvency.

What the petitioner has failed to recognize, however, is that the trustee may sue

to set aside transfers that are fraudulent as to creditors under either applicable state law, in this case the Uniform Fraudulent Conveyances Act, or under the federal adaptation of that Uniform Act, the Federal Bankruptcy Act, § 67. Jurisdiction to proceed under applicable state law is conferred upon the trustee under § 70e of the Federal Bankruptcy Act. As Collier states:

"Since 70e(1) relates wholly to the applicable state or federal law with respect to the voidability of a transfer or obligation, such law will control as to whether a valid claim and right of avoidance still subsists at the time of bankruptcy in the creditor whose rights the trustee assumes to assert. Thus where the creditor's remedy is barred by the running of the Statute of Limitations prior to bankruptcy, the trustee is likewise barred. Section 70e(1) provides no conditions or time limits within which transactions are deemed voidable. It merely incorporates the applicable state or federal law in this regard. Consequently, the four-month and one-year limitations established in §§ 60 and 67 are inapplicable in a suit under § 70e. Sections 67d and 70e present different and independent methods whereby the trustee may move to invalidate a transfer deemed fraudulent. And the fact that present 67d incorporates much of the Uniform Fraudulent Conveyances Act does not prevent the trustee from invoking a state adaptation of the Uniform Act, where that better suits his purpose." 4A Collier, Bankruptcy, § 70.-71, pp. 799–802.

It is apparent from the pleadings in this case that the trustee has, at all times, pursued his remedy in state court under applicable state law, jurisdiction therein conferred by § 70e. Under that section, he must demonstrate that he is asserting the right of a creditor of the bankrupt against whom the particular transfer was fraudulent. *Id.* at 787. The question of the fraudulent transfer must be determined by the state law governing the transaction. *Id.*

Our resort to § 67d of the Federal Bankruptcy Act in our original opinion was, then, prompted merely as an interpretative devise of our applicable state law, the Uniform Fraudulent Conveyance Act, T.C.A. §§ 64–301—64–321. Section 67d of the Federal Bankruptcy Act condenses the substance of the Uniform Fraudulent Conveyances Act and retained wherever possible both its language and substance. 4 Collier, Bankruptcy, § 67.29, p. 475, n. 6. Section 67d(2)(d) corresponds almost exactly to our applicable state statute, T.C.A. § 67–315.

Those provisions being almost identical, we used Collier's informative treatise on Bankruptcy to construe our state statute. The resulting construction was both a workable solution to the establishment of actual fraudulent intent, and the proposition that under this particular statute, the trustee was under no duty to show that the transaction either precipitated or was consummated during the bankrupt's insolvency. We might also note here as we did in our original opinion at page 26 that the discussion at pp. 25–26 with reference to whether the trustee could maintain the suit, the measure of recovery, and its distribution is fully applicable to a proceeding under § 70e as well as § 67d.

Returning to the statute of limitations question, it is clear that our state statutes are dispositive of the petitioner's contention, in that the one year limitation in § 67d(2) of the Federal Bankruptcy Act is not present in the Uniform Fraudulent Conveyances Act. As stated in Davis v. Willey, 45 Am.B.R. 348, 263 F. 588 (D.C. N.D.Cal.1920), aff'd 273 F. 397 (9th Cir. 1921):

"It is well established that the effect of this section (§ 70e) is to clothe the trustee with no new or additional right in the premises over that possessed by a creditor, but simply puts him in the

shoes of the latter, and subject to the same limitations and disabilities that would have beset the creditor in the prosecution of the action on his own behalf; *and the rights of the parties are to be determined, not by any provision of the Bankruptcy Act, but by the applicable principles of the common law, or the laws of the state in which the right of action may arise.* In other words, the Bankruptcy Act merely permits the trustee to assert the rights which the creditor could assert but for the pendency of the bankruptcy proceedings,  . . ." (emphasis added).

In applying the correct limitation period, we look first to our state enactments of the Uniform Commercial Code, T.C.A. § 47–1–101 et seq. The only possible applicable limitation therein appears in T.C.A. § 47–4–406 but that section is inapplicable in this case as the Clear Creek Coal Company, the creditor whose right the trustee is asserting, does not fall within the definition of a customer. *See,* T.C.A. § 47–4–104. Even if it could be so construed, the applicable limitation therein, under the facts of this case, would be three years.

The Uniform Commercial Code does provide however, at T.C.A. § 47–3–419 that:

"(1) An instrument is converted when . . . (c) it is paid on a forged endorsement."

We held, in this case, that even while the forged endorsements were effective to pass title under T.C.A. § 47–3–405(1)(b), the defendant bank was liable thereon as they could not qualify for holder in due course status as notice of the irregular nature of the transactions appeared on the face of the instruments.

The Comments to the Official Text of T.C.A. § 47–3–419 read as follows:

"Subsection (1)(c) is new. It adopts the prevailing view of decisions that payment on a forged endorsement is not an acceptance, but that even though made in good faith it is an exercise of dominion and control over the instrument inconsistent with the rights of the owner, and results in liability for conversion."

That result would not always hold true in light of T.C.A. § 47–3–405 if a customer of the bank was, in fact, involved. As the Comments to the Official Text of T.C.A. § 47–4–406 point out:

"Nothing in this section is intended to affect any decision holding that a customer who has notice of something wrong with an endorsement must exercise reasonable care to investigate and notify the bank. It should be noted that under the rules relating to imposters and signatures in the name of a payee (Section 3–405) *certain* forged endorsements on which the bank has paid the item in good faith *may be treated* as effective notwithstanding such discovery and notice." (emphasis added).

While we treated the forged endorsements as effective in the instant case, and while the defendant bank paid the items in apparent good faith, they are still liable under these unique facts due to the notice apparent on the face of the instruments. We must conclude, therefore, that in light of T.C.A. § 47–3–419 the instruments were converted and, absent an appropriate limitation in the Uniform Commercial Code, apply our general limitation period of three years as pertains to the conversion of personal property. *See,* T.C.A. § 28–305.

It being apparent that the action was timely filed, the petition to rehear is accordingly denied.

DYER, C. J., CHATTIN and Mc-CANLESS, JJ., and WILSON, Special Justice, concur.